**UNITED STATES of America,
Plaintiff,**

v.

**Joseph ABBOUD, Defendant.**

**No. 8:99CR80.**

United States District Court,
D. Nebraska.

Nov. 30, 2000.

See, also, 165 F. Supp.2d 969.

Alan G. Stoler, Omaha, NE, for David Abboud.

Kirk E. Naylor, Jr., Naylor Law Firm, Lincoln, NE, for Joseph Abboud.

Robert B. Creager, Anderson, Craeger Law Firm, Lincoln, NE, Leslie D. Ware, Monts, Ware Law Firm, Dallas, TX, for Baron Abboud.

Edward L. Wintroub, Wintroub, Rinden Law Firm, Omaha, NE, for Gene Abboud, G & A Distributing, Inc.

Dana C. Bradford, III, Bradford, Coenen Law Firm, Omaha, NE, for Susan Germer, Infinite Electronics.

Richard A. Ripley, Howrey, Simon Law Firm, Washington, DC, for Martin J. Weinstein.

Russell X. Mayer, Assist. U.S. Attorney, Omaha, NE, for U.S.

## ORDER

STROM, Senior District Judge.

This matter is before the Court on defendant, Joseph Abboud's, amended motion to dismiss Count 1, Count 36 and Counts 54–62 of the Superseding Indictment (Filing No. 148). The magistrate judge held a hearing on the motion which lasted several days: April 3, 2000, April 5, 2000, April 26, 2000, and May 31, 2000. On August 21, 2000, the magistrate judge issued a report and recommendation that

Joseph Abboud's motion to dismiss be denied (Filing No. 268). The defendant filed a timely objection to the magistrate judge's report and recommendation (Filing No. 271).

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has conducted a *de novo* review of the defendant's amended motion, the transcripts of the hearings (Filing Nos. 221, 231, 239 and 253), the report and recommendation of the magistrate judge, the defendant's objections, and the parties' briefs.

## DISCUSSION

The magistrate judge has carefully and meticulously set forth the background facts and circumstances applicable to a proper disposition of defendant's amended motion. Having reviewed the transcripts, the Court is satisfied that the magistrate judge's background and factual findings are correct and that the law has been properly applied. The Court finds that the report and recommendation should be approved and adopted in its entirety. Accordingly,

IT IS ORDERED:

1) The report and recommendation of the magistrate judge (Filing No. 268) is approved and adopted.

2) Defendant Joseph Abboud's objection (Filing No. 271) is denied.

3) Defendant Joseph Abboud's amended motion to dismiss (Filing No. 148) is denied.

### REPORT AND RECOMMENDATION

JAUDZEMIS, United States Magistrate Judge.

This matter is before the court on the amended motion of defendant, Joseph Abboud, to dismiss Counts 1, 36, and 54 through 62 of the superseding indictment (# 148). An evidentiary hearing was held on April 3, 2000 (# 221), April 5, 2000 (# 231), April 26, 2000 (# 239), and May 31, 2000 (# 253). The final post-hearing brief was received on June 23, 2000, at which time the motion was deemed submitted.

On September 30, 1996, Joseph Abboud pled guilty in the Northern District of Georgia to three felony counts and two misdemeanor counts of Unauthorized Reception of Cable Television Services in violation of 42 U.S.C. § 553. A conspiracy count was dismissed as part of the Georgia plea agreement. *See United States v. United Imports Corp., et al.*, case No. 1:96–CR–61–JEC (N.D.Ga). Judge Julie E. Carnes presided over the Georgia prosecution.

In the instant motion to dismiss, Mr. Abboud contends that he has been charged with the conspiracy alleged in Count 1 of the Nebraska superseding indictment in violation of the Fifth Amendment's Double Jeopardy Clause. He further contends that, by indicting him in this case, the government breached the negotiated plea agreement accepted in the Northern District of Georgia.

For the reasons discussed below, I shall recommend that the motion to dismiss be denied.

## I. BACKGROUND

### A. The Georgia Investigation

In approximately May 1992, electronic equipment manufacturers approached the U.S. Attorney's Office in Atlanta, Georgia, complaining that there were companies obtaining their devices, altering them, and selling them in a state that enabled people to illegally receive premium cable television programming. The U.S. Attorney asked the manufacturers to provide more specific information.

Scientific Atlanta, a major manufacturer of cable converter boxes, was a complain-

ing manufacturer. In August or September of 1992, Scientific Atlanta participated in a meeting with the U.S. Attorney and FBI in Atlanta and described certain information they developed regarding the activities of M.D. Electronics in Omaha. As a result of this meeting, the Atlanta division of the FBI opened an undercover investigation in late summer 1992 and began working with Denver Mock, a Pinkerton investigator retained by Scientific Atlanta.

Mock's role in the investigation was to pose as an unauthorized distributor of cable converter boxes and make contact with buyers in Omaha. Accordingly, Denver Mock contacted Gene Abboud and offered himself as a person with access to the type of cable converter boxes sold by M.D. Electronics. Mock described himself as an "unauthorized" distributor of Scientific Atlantic equipment. Gene Abboud subsequently purchased equipment from Denver Mock for shipment to Omaha.

Between September 1992 and February 1993, Mock sold 2,200 cable boxes in four different sales to Gene Abboud.[1] Scientific Atlanta provided the descramblers to Mock for purposes of the investigation. The devices were shipped to Omaha and Denver Mock received total payment of $325,000 in cashiers checks from Gene Abboud. The cable boxes were specially marked so they could be identified as having come from Denver Mock and sold to Gene Abboud.

FBI Special Agent Robert Goffi testified that local FBI offices participate in various investigations as requested. For example, the Omaha FBI office will provide assistance if part of another office's investigation had to be done in Omaha. The Nebraska FBI office assisted and supported the Atlanta investigation in this capacity.

The four undercover purchases of equipment from Denver Mock resulted in a search warrant being obtained and executed in February 1993 for M.D. Electronics in Omaha.[2] Agent Goffi assisted as a "worker bee" during the 1993 search. Pursuant to the search warrant, the FBI seized business records and about 10,000 cable descramblers from M.D. Electronics. The items seized were all sent to Atlanta.

### B. The Georgia Indictment

On February 6, 1996, Joseph Abboud, Gene Abboud, United Imports Corp. a/k/a M.D. Electronics, and G & A Distributing, Inc. were indicted in the Northern District of Georgia on 12 counts of wire fraud, five counts of unauthorized interception and reception of cable service, four counts of money laundering, one forfeiture count, and one conspiracy count (Ex. 1). The conspiracy count (Count 13) alleged:

37. Beginning approximately August, 1992 and by continuing through February 1993, in the Northern District of Georgia and elsewhere, the defendants, UNITED IMPORTS CORP., a/k/a/ M.D. ELECTRONICS, G & A DISTRIBUTING, INC., JOE ABBOUD, and GENE ABBOUD, and others, known and unknown to the Grand Jury, did combine, conspire, confederate, agree and have a tacit understanding with each other and with others known and unknown to commit certain offenses against the United States, to wit:

1) That they would devise a scheme and artifice to defraud cable companies of money and use interstate wires and

---

1. Gene Abboud is the father of Joseph Abboud.

2. Agent Goffi testified that business records and cable descramblers had also been seized from M.D. Electronics in 1989 pursuant to a search warrant. These items were returned to the Abboud businesses after the Omaha U.S. Attorney's Office declined to prosecute.

communications in execution of the scheme and artifice, all as fully set forth in Counts One through Twelve and incorporated herein by reference, in violation of Title 18, United States Code, Section 1343; and

2) That they would willfully and for the purpose of commercial advantage or private financial gain assist in the unauthorized interception and reception of basic, premium, and pay-per-view cable service transmissions by modifying and distributing for sale to their retail customers certain equipment intended by defendants to be used for the unauthorized reception of communications services offered over a cable system, all as fully set forth in Counts Fourteen through Eighteen, and incorporated by reference, herein, in violation of Title 47 United States Code, Section 553(a).

The Atlanta indictment summarized the conspiracy as follows. Between August 1992 and February 8, 1993, Gene Abboud and G & A Distributing arranged for purchases of cable boxes and descramblers by using interstate wire communications, with the objective of making retail sales of electronic equipment primarily useful for the unauthorized interception of electronic communications. Defendants Joe Abboud and M.D. Electronics modified the cable boxes and descramblers sold to them by G & A and Gene Abboud, rendering the equipment primarily useful for the unauthorized reception of cable signals. Joe Abboud and M.D. Electronics then sold the modified boxes and descramblers to retail customers through an interstate "1–800" telephone number with the objective of making retail sales of electronic equipment primarily useful for the unauthorized interception of electronic communications.

The indictment, at paragraph 39, described approximately 30 overt acts committed between August 17, 1992 and February 1993 in furtherance of the conspiracy, including four purchases of Scientific Atlanta converter boxes and decoders by Gene Abboud and G & A Distributing from the "cooperating witness," now known to be Denver Mock; Gene Abboud's corresponding purchases of cashier's checks from Hawkeye Bank of Council Bluffs, Iowa and delivery of the cashier's checks to Denver Mock in payment for shipments of cable equipment; Gene Abboud's acceptance of each shipment of cable boxes; Gene Abboud's deliveries of cable boxes to M.D. Electronics; M.D. Electronics' corresponding issuance of checks drawn on its account at First National Bank of Omaha to pay G & A Distributing for the cable boxes; modification of cable boxes by M.D. Electronics and Joe Abboud; shipment of modified cable boxes to customers via United Parcel Service (UPS) and to a Scientific Atlanta employee in the Northern District of Georgia posing as a customer; interstate wire communications between Gene Abboud and the cooperating witness on October 12 and 13, 1992; shipment of a modified Scientific Atlanta box via UPS from Texas to Gene Abboud and G & A Distributing on February 9, 1993; the sale of modified cable boxes to retail customers Paul Harr, Ronald Hardaway, Larry Clemmons, Gregory Panasuk, Richard Carrier and Sam Billingsley; assisting in the unlawful interception and reception of premium and pay-per-view cable service by retail customers Hardaway, Clemmons, Panasuk, Carrier and Billingsley; cable theft by retail customers; and bank deposits related to the sales of the cable boxes.

### C. The New Jersey "Cable Trap" Investigation

During the time of the Atlanta investigation, the New Jersey FBI office was conducting an ongoing operation in New Jersey called "Cable Trap." In the New

Jersey investigation, Joseph Abboud was identified as a person having business dealings with John Mathewson, the president of Guardian Bank & Trust (GBT), located in the Cayman Islands. Mathewson was arrested in July 1996 and began cooperating in the Atlanta investigation at that time (see Ex. 12).

### D.   Guardian Bank & the "Shelf" Corporations

The Cayman government took control over Guardian Bank & Trust in January 1995 and had control over the bank's records as of that time. After his arrest in July 1996, Mathewson cooperated in the Atlanta investigation. Mathewson advised that most of his clients opened a GBT account to "have assets outside the system and save on taxes." (Ex. 12). He told the Atlanta investigators that he organized "shelf" corporations in the Cayman Islands and sold the corporations to clients at GBT. The clients would then maintain their bank accounts in the names of the Cayman Islands shelf corporations.

Mathewson verified that Joseph, Barry, David and Gene Abboud all had accounts at GBT. Mathewson dealt mainly with Joseph Abboud, who reportedly purchased Script Corporation from Mathewson in April 1989.

Curt Mantz, who acted as general manager of United Imports from the fall of 1992 through September 1996, testified as to United Imports' business operations, including use of the Script Corporation account. Mantz testified that 90 to 95% of United Imports' business involved the sale of television converters and descramblers. Everquest was the wholesale division and M.D. Electronics was the retail division of United Imports; they did not have offices separate from United Imports. Everquest acquired equipment for sale to retail customers by M.D. Electronics through use of an "800" number. United Imports advertised the converter/descramblers and its 800 number in national publications. The orders were shipped via UPS.

In the wholesale operation, Mantz would purchase equipment either overseas or domestically for the purpose of selling it through M.D. Electronics. Mantz testified that it was "a constant thing" for United Imports to buy from and sell to Gene Abboud's company, G & A Distributing. In summary, from 1992 through 1996, United Imports engaged in purchasing equipment for resale from both overseas and domestic sources. It purchased descramblers from business competitors and, on occasion, sold such equipment wholesale to competitors. It made retail sales of converter descramblers. United Imports purchased "800" numbers from competitors who were going out of business. The structure of United Imports did not change during the term of Mantz' employment.

Mantz testified that United Imports was associated with the accounts held at Guardian Bank & Trust for Script Corporation. He explained that suppliers would manufacture and sell converter descramblers for the use of United Imports. The suppliers would initially bill Script Corporation. Script would then bill United Imports. United Imports would send checks to Script Corporation in the Cayman Islands for payment of the equipment. The checks from United Imports ranged from $50,000 to $400,000. Mantz testified that United Imports began sending checks to Script Corporation shortly after fall 1992. The process continued in this manner throughout Mantz' employment with United Imports.

### E.   The Georgia Plea Agreement

The Georgia indictment against Joseph Abboud, Gene Abboud, United Imports Corp. a/k/a M.D. Electronics, and G & A

Distributing, Inc. had been indicted in Georgia on February 6, 1996. The defendants were represented by counsel, as follows:

| | |
|---|---|
| Joseph Abboud | Bobby Lee Cook (Summerville, GA) |
| | Branch Connelly (Summerville, GA) |
| United Imports | F. Joseph Warin (Washington, DC) |
| | Charles Asher (South Bend, IN) |
| Gene Abboud | James Martin Davis (Omaha, NE) |
| G & A Distributing | James Martin Davis |

Assistant U.S. Attorney Martin J. Weinstein was lead counsel for the government.

Mr. Davis was the only member of the defense team called to testify in conjunction with the pending motion.[3] Davis testified that there were numerous meetings among defense counsel in the Georgia case. Plea negotiations accelerated as the result of John Mathewson's July 1996 arrest. Davis testified that he first learned from Mr. Warin that the government was threatening prosecution for international money laundering based upon information received from Mathewson. Shortly thereafter, Davis learned from Mr. Weinstein that the government was considering pursuing an international money laundering case against Gene Abboud. (# 221, 44:14–45:8). The original Georgia indictment only had domestic money laundering counts. Davis stated that he was "shocked" to hear this information from Mr. Warin. According to Davis, the charges against Gene Abboud involved only $30,000; however, the Cayman Islands bank accounts identified by Mathewson were much larger and would substantially affect the offense level under the Sentencing Guidelines.

Davis testified that, to avoid confusion and duplication of effort, Mr. Warin acted as lead defense counsel in the plea negotiations. Mr. Warin summarized the status of the plea negotiations in a letter dated September 26, 1996 addressed to defense counsel and Joseph Abboud (Ex. 14). Warin's letter explained that "[t]he underlying motivation remains that the defendants will be not incarcerated." In particular,

1. All defendants would plead guilty to Count 1 and Counts 14 through 18.[4]

2. The pleas would be admissions of guilty by the defendants.

3. Total fines imposed would be comprised of: forfeiture of $633,000 previously seized; forfeiture of $800,000 in equipment previously seized; transfer to the government of decoder equipment owned by M.D. Electronics valued at $2 million to $2.5 million; payment by the defendants of a $1.1 million fine to the government, the allocation of which to be determined by the government.

4. Government to stipulate that the fraud loss for the Sentencing Guidelines would be $38,000. "The government's willingness to stipu-

---

**3.** Defendant's subpoena on Bobby Lee Cook was withdrawn, as Mr. Cook was undergoing chemotherapy for colon cancer. (Ex. 19). Apparently, Mr. Warin could not be served with a subpoena in April 2000 because he was out of the United States at that time. (Ex. 20).

**4.** Mr. Davis testified that Mr. Weinstein indicated prior to September 26, 1996 that any plea agreement would be a package deal relating to both Joseph and Gene Abboud. If Davis' client, Gene Abboud, did not plead guilty, then Joseph Abboud would not be al-

lowed to plead guilty. Weinstein reportedly told Davis that, if Joseph Abboud and his companies pled guilty, the government would not charge them with Cayman Island money laundering. Davis explained on cross-examination that a money laundering conviction would have been significant in terms of the sentencing guidelines as to Joseph Abboud. Mr. Davis did not feel that the government's case against Gene Abboud was particularly strong; however, Gene had to plead guilty if Joe was to get the benefit of the plea agreement.

late to the modest amount of $38,000 fraud loss is a major concession."

5. Government to stipulate that the sentencing should be controlled by Sentencing Guideline 2B5.3 (Criminal Infringement of Copyright or Trademark) and not the fraud loss guideline, 2F1.1, another "major concession."

6. Parties agree that the Guideline level for Joe Abboud is 10.

7. Defendants to remain free pending sentencing.

8. Mr. Weinstein to return as a special Assistant U.S. Attorney for the sentencing hearing.[5]

9. "These pleas will resolve all matters arising out of the bank accounts in the Cayman Islands" except for Title 26 offenses (criminal/civil tax) and the remaining counts of the indictment will be dismissed.

10. Although the government and defendants will stipulate to collective fines of $1.1 million, "this is *not* a Rule 11(e) agreement that the Court must accept the recommended disposition of the case or the defendant may withdraw the guilty plea."

Among other things, Mr. Warin stated that defense counsel "should try to extract a commitment from the government that it will seek to dissuade other prosecutors from pursuing additional charges against all of the defendants in this investigation." He also advised that Judge Carnes would "specifically inquire of each defendant what promises have been made to induce them to plead guilty."

On September 27, 1996, Judge Carnes held a conference in chambers with counsel concerning the status of the plea negotiations (see Ex. 15 transcript). Mr. Davis participated by telephone. Mr. Weinstein initially explained that the parties wished to advise the court that plea negotiations were substantially completed. Mr. Weinstein outlined for the court certain issues relating to the plea agreement, specifically: (a) the defendants would plead guilty to the felony and misdemeanor charges involving unauthorized interception of cable signal; (b) guideline calculations based on economic loss; (c) allocation and payment of an approximately $1 million fine; (d) pending forfeiture actions; and (e) the government's view that this was a "nonincarceration matter." Counsel agreed with Judge Carnes' assessment that the defendants were "first offender businessmen-type people" who were willing to "go higher than what the fine range might be in hopes that I will think that is enough, so that even though I always have the power to send somebody to jail that I might think that is not a very good idea in this case." Judge Carnes then said it sounded like counsel had worked out a reasonable agreement. Mr. Connelly told Judge Carnes that the defendants would be "leaving the nonaddressable cable descrambler business."

Mr. Davis testified that he spoke with Mr. Weinstein on September 27 and September 30, 1996. On both occasions, Weinstein reaffirmed that no international money laundering charges would be filed against Gene Abboud, but that Gene had

---

5. Mr. Weinstein was in the process of leaving the U.S. Attorney's Office. His last day was Monday, September 30, 1996. Thus, the plea offer would expire at 5:00 p.m. September 30, 1996. Warin advised that if the pleas were not accepted, the case would be reassigned to a new prosecutor and ultimately a superseding indictment would be returned charging money laundering and tax offenses.

to plead guilty if Joseph Abboud was to get the benefit of the plea bargain.

Pursuant to the plea agreement, Joseph Abboud and the other defendants pled guilty in the Northern District of Georgia on September 30, 1996 (see Ex. 17 transcript). Joseph Abboud appeared with his attorneys and stated on the record that he wished to change his plea to Counts 14 through 18 of the indictment from a plea of not guilty to a plea of guilty (3:5–11). Mr. Abboud and Mr. Asher verified that they had signed the negotiated plea agreement on behalf of United Imports (3:21–4:5). Joseph Abboud and Mr. Connelly then verified that they had signed the negotiated plea agreement on behalf of Joseph Abboud individually (4:11–5:8). The procedure was repeated with respect to defendants Gene Abboud and G & A Distributing. Defense counsel then agreed it would be acceptable to conduct the four arraignments simultaneously instead of individually (7:13–17). In this regard, the court cautioned:

> The fact that we are doing the questioning together with both of you [Joseph Abboud and Gene Abboud] should not indicate that you shouldn't listen carefully to my questions. We are not trying to rush through this in any way, gentlemen. And if either of you have any questions about what I am asking you and you don't understand something, please let me know so that I can give you all the time you need to confer with your counsel.

(7:19–25). Both Joseph and Gene Abboud told the court they understood.

In response to the court's questions, Joseph Abboud stated that he was 34 years old, had two years of college, and attended the University of Nebraska. He had not taken any narcotic drugs, medicine or pills in the last 24 hours. He consumed one beer the previous night, but did not feel impaired in any way at the time of the plea hearing. Joseph Abboud stated that he did understand what they were doing in the proceeding. Mr. Cook told the court he was "thoroughly apprised" that Joseph Abboud was quite competent to plead guilty.

After eliciting similar information from Gene Abboud, the court advised the defendants as follows:

> THE COURT: First, under the Constitution and laws of this country you are each entitled, as is the company, to a trial on these particular charges in front of a judge or a jury, and you would be entitled to the assistance of counsel at such a trial. Do you understand that you would be pleading guilty you obviously give up the right to a trial? Mr. Joe Abboud?
>
> MR. JOE ABBOUD: Yes, I do.
>
> \*    \*    \*    \*    \*    \*
>
> THE COURT: Do you all understand that at a trial you would be presumed to be innocent and the government would have to prove you guilty beyond a reasonable doubt. Further, neither of you would have any obligation to prove anything, including your own innocence. Do you understand that, Mr. Abboud?
>
> MR. JOE ABBOUD: Yes, I do.
>
> \*    \*    \*    \*    \*    \*
>
> THE COURT: Now, if you've watched any TV at all, I'm sure you understand that the procedure is generally that the government has witnesses come to court. They testify in front of you and everybody. Your attorneys can cross-examine them if they want to. Your attorneys can object to evidence the government offers if they've got anything to object to. Your attorneys can introduce evidence on your behalf if they have any helpful evidence that they could introduce.

Do you understand that by not having a trial, you of course give up those things as well? Mr. Abboud?

MR. JOE ABBOUD: Yes.

\*     \*     \*     \*     \*     \*

THE COURT: All right. Now, if we were to have a trial, you would have the right to testify if you wanted to, but nobody could make you testify if you didn't want to do that. Do you understand that, Mr. Abboud?

MR. JOE ABBOUD: Yes, I do.

\*     \*     \*     \*     \*     \*

THE COURT: ... Because you are pleading guilty, however, the situation is a little different. I will have to ask you in a moment some question about what it is that you did, and I would expect, since you are standing here pleading guilty, you are probably going to tell me that you did something wrong, that is, that you violated the law. So in the context of pleading guilty, you will be asked questions, the answers to which likely will incriminate you. Do you understand that, Mr. Abboud?

MR. JOE ABBOUD: Yes, I do.

\*     \*     \*     \*     \*     \*

THE COURT: In summary, are you willing to waive and give up your right to a trial and the other rights we have just discussed?

MR. JOE ABBOUD: Yes.

(Ex. 17, 10:17–13:17). Mr. Weinstein then recited the factual basis for the guilty pleas:

Your Honor, were this case to go to trial, the United States would provide evidence that would show the following:

That in 1992, and for some period of time before and both after these particular charges, Mr. Joseph Abboud was the president of a company by the name of United Imports which did business as M.D. Electronics.

Mr. Gene Abboud was the officer, in fact in many ways the sole proprietor, of a company by the name of G & A Distributing which also did business in the Omaha, Nebraska area. M.D. Electronics, United Imports, was in several businesses, one of which was the procuring and distribution of cable converter boxes. And the cable converter boxes were sold into various districts, various parts of the United States through an 800 number.

The primary purpose of the cable converter boxes was to assist in the unlawful interception and reception of premium and pay per view cable service.

Mr. Gene Abboud, in this particular instance, your honor, was responsible for procuring certain cable converter boxes which were then transferred or sold to M.D. Electronics, United Imports, and these boxes were altered at M.D. Electronics so they were made ready and primarily useful in the purpose of interception and assisting in the interception of cable television signal.

The specific counts that we are dealing with and the specific crimes that are the subject of the pleas dealt with the sale of certain of these boxes into the Northern District of Georgia on the dates set forth in the indictment, that being October 31, November 9, December 15, January 20, February 4th of the years 1992 and 1993.

With regard to these specific charges, that the defendants, Mr. Gene Abboud and his company and Mr. Joe Abboud and his company, for the purpose of commercial advantage and unlawful interception and reception of premium and pay per view cable service transmissions, did procure, manufacture, and distribute for sale to retail customers this equipment, being these cable converter boxes. And that this was part of an

attempt to assist the retail customer in the unauthorized interception of cable signal; that is, basically attaching the box to their television and receiving cable television signal without paying for it.

The individuals who received the boxes are set forth in the indictment. They are in the Northern District of Georgia. And that is the sum and substance of the counts. And obviously these actions were done willfully and with the appropriate venue in the Northern District of Georgia.

(Ex. 17, 13:22–15:18). Mr. Cook, on behalf of Joseph Abboud, stipulated and agreed that the offer of proof was entirely correct and there was indeed a factual basis for the plea.

The court found that there was a factual basis for the plea (17:5–7). The court then inquired of Joseph Abboud:

THE COURT: ... Mr. Joe Abboud, has anyone threatened or forced you to plead guilty?

MR. JOE ABBOUD: No, they haven't.

THE COURT: Other than the plea agreement that we will talk about in just a minute, has anyone told you that if you don't plead guilty something bad might happen to you or other charges might be brought against you?

MR. JOE ABBOUD: No, your honor.

(Ex. 17, 17:8–15). The court then explained that plea agreements were perfectly permissible, provided that the court understand what all the promises and the terms are:

THE COURT: ... And by that I mean that if you all believe that there have been any side agreements or side promises made by anybody to you with regard to this plea and the sentence the court will impose in the future, you need to let me know right now. Because if you don't let me know right now what

your understanding of all the promises are, you will never be able to enforce those particular promises. Do you understand that, Mr. Abboud?

MR. JOE ABBOUD: Yes, I do.

(Ex. 17, 18:1–9). Joseph Abboud then advised the court that Mr. Weinstein's proffer was correct and accurate. (18:20).

The court then reviewed the written plea agreements (see Ex. 16, Negotiated Plea). Mr. Weinstein summarized the most important points, describing the offenses as copyright or intellectual property cases. He indicated that the government agreed to recommend credit for acceptance of responsibility and agreed that Sentencing Guideline section 2B5.3 should apply because it was appropriate for criminal copyright or patent violations. Because of the difficulty in calculating fraud loss in such a case, the parties agreed that the appropriate fraud loss for the crimes charged was $39,569.77. The defendants agreed to waive all their rights in related forfeiture proceedings involving $633,000 in currency and certain cable converter boxes. It was recommended that G & A Distributing not pay a fine, that Gene Abboud pay a $50,000 fine, that United Imports pay a $50,000 fine, and that Joseph Abboud pay a $1 million fine (22:10–15). The defendants agreed to waive their right to appeal except in certain circumstances set forth in the written plea agreement. The agreed fine exceeded what the guideline range would require but did not exceed the statutory amount.

In response to the court's questions, Joseph Abboud and his attorney both indicated that Mr. Weinstein had completely and correctly summarized the terms of the plea agreement.

The court granted defense counsel's request that it incorporate by reference the transcript of the September 27, 1996 status conference. (25:2–6).

The court next discussed sentencing issues including a maximum possible jail term of 10 years and a maximum possible fine of $250,000 per count or a total of $1,250,000 per defendant. Mr. Weinstein informed the court that the two defendant corporations were "not doing real well" financially. The court advised the defendants that it had the power to sentence them up to 10 years' imprisonment, a three-year period of supervised release, and a maximum fine of $1.25 million for each of the four defendants. The defendants might also be ordered to make restitution[6] to any victim of the offenses.

Joseph Abboud indicated that he understood this information, that he was aware of the sentencing guidelines, and that he had discussed the operation of the sentencing guidelines with his attorney. Mr. Cook advised that he and Mr. Connelly had discussed "best case, worst case" scenarios with Joseph Abboud and with Mr. Weinstein. The court advised that neither the attorneys nor the court were in a position to promise a certain sentence; the calculation could be done only after the presentence report was completed. The court might determine that the fraud loss amount exceeded $39,569.77. For these reasons, it was important for the defendants to understand that they would not be allowed to withdraw their pleas if the sentence turned out to be harsher than they anticipated. Joseph Abboud indicated that he understood. (31:10–34:5). Joseph Abboud also acknowledged that the proposed $1 million fine might exceed the requirements of the sentencing guidelines. (34:21–25). He indicated to the court that he had discussed with his attorneys all matters involving his right to appeal and that he wished to waive his right to appeal as set out in the plea agreement. (36:2–22).

The court then accepted the defendants' pleas of guilty. (40:12–17).

The written negotiated plea agreement was signed in the courtroom on September 30, 1996.

Joseph Abboud testified concerning his impressions of the September 30, 1996 plea hearing. He recalled that in late August or early September 1996 there was a possibility that a superseding indictment would be returned in Georgia charging him with money laundering in the Cayman Islands. He participated in a meeting with defense counsel in a conference room at the Atlanta airport to discuss issues regarding the potential money laundering charges. After this meeting, Mr. Abboud received Mr. Warin's September 26, 1996 letter. He was out of the country, but returned to the United States to discuss the letter with his attorney, Branch Connolly.

Mr. Abboud testified that he participated in several meetings with Mr. Davis and Gene Abboud in Davis' office, where they discussed plea negotiations with the other attorneys. Mr. Warin proposed that if the defendants all pled guilty, the government would not prosecute the allegations of international money laundering involving the Caymans. Joseph Abboud agreed to accept the offer and communicated that decision to "all of the attorneys." He did indeed understand that it was a "package deal." There were several times when Gene Abboud did not want to negotiate, but the government "would have no part of that." The defendants ultimately accepted the plea agreement.

Joseph Abboud characterized the plea negotiations as "rushed." He flew to the United States, flew to Atlanta the morning of the plea, arrived in the courtroom

---

**6.** The government did not seek restitution because it would be difficult to set a proper amount and because the fines imposed would tend to serve the purpose of restitution.

around 9:30 or 10:30 a.m., held the hearing and signed the papers. He acknowledged that the written plea agreement (Ex. 16) does not mention money laundering in the Cayman Islands. He relied on his attorneys to make sure the matter was taken care of.

Joseph Abboud testified that he had not expected to be asked about "other inducements" during the September 30, 1996 plea hearing. He stated that he was "shocked" that the question was asked and didn't know what to say. Nor did Mr. Abboud expect to be asked if he had been "threatened" into pleading guilty. He testified: "Well, heck, yes, they threatened me.... I wanted to say something. Yes I was threatened, otherwise I wouldn't be here." At this point, his attorney nudged him and told him to say "no."

Defendant subpoenaed Mr. Weinstein to testify on April 26, 2000. Mr. Weinstein testified that he was employed as an Assistant U.S. Attorney in Atlanta from 1989 through the summer of 1996. Since 1996, he has been in private practice in Washington, D.C. Mr. Weinstein testified that he had no independent recollection of the grand jury proceedings or the criminal case involving the Abbouds. He had no recollection of how the Abboud plea agreements were negotiated; however, it was his standard practice to make no promises that were not contained in the written plea agreement or otherwise disclosed to the district court. It was his practice to disclose any legally binding agreements in a negotiated plea.

The defendants were sentenced in Georgia on April 4, 1997 by Judge Carnes. Initially, the presentence report recommended that the fraud loss be set at $3.8 million instead of the $39,569.77 figure set out in the plea agreement. After discussing the unusual features of the case, the court found "that the amount of fraud was more than $39,000" but, for the reasons

stated on the record, the court would "depart down to that figure as an appropriate loss figure." (Ex. 18, 21:5–11). The court departed up to the agreed-upon fine under the theory that it would be improper for the defendants to retain their ill-gotten gain and restitution was impractical in this case. The court sentenced Joseph Abboud to 5 years' probation (including 6 months' home confinement) and a $950,000 fine. After sentence was imposed, the prosecutor, Sally Q. Yates advised the court of the pending New Jersey investigation which involved the Abbouds' companies. Yates advised that the Abbouds "may very well end up being prosecuted later on about that," but not in the Northern District of Georgia.

### F. The MLAT Documents

Some time after Mathewson's arrest in July 1996, the Atlanta FBI division made a Mutual Legal Assistance Treaty (MLAT) request for records maintained by Guardian Bank & Trust concerning accounts owned by members of the Abboud family. In response, the government of Grand Cayman (British West Indies) provided "extensive" documents which arrived in Atlanta in November 1996, over one month after Joseph Abboud pled guilty to the five counts charged in the Georgia indictment.

### G. The Nebraska Investigation & Indictment

Agent Goffi testified that he became involved in the Abboud investigation in Nebraska in October or November 1997. Goffi's investigation focused on United Imports and M.D. Electronics and how they did business. Goffi was advised by the Assistant U.S. Attorney that the U.S. Secret Service was investigating companies in Omaha selling cable descrambler devices. He contacted Secret Service agents

John Seubert and Howerter in January 1998.

John Seubert testified that he has been a special agent with the U.S. Secret Service since 1995. As discussed above, the Atlanta FBI office received the business records of Guardian Bank & Trust in November 1996 pursuant to an MLAT request. According to Seubert, the Nebraska law enforcement group first became aware of the MLAT documents in March 1998 and took possession of the 5,000 MLAT documents in April 1998. The Nebraska agents reviewed the documents extensively.

Nebraska law enforcement interviewed John Mathewson in March 1998, a month prior to receiving the 5,000 MLAT documents. Mathewson gave an overview of the Abbouds' business dealings with Guardian Bank. The documents themselves tended to "fill in the blanks."

Seubert testified that in November 1998, the FBI searched a dumpster at United Imports and recovered documents labeled "Legend Capital Management" and multiple investment accounts handled by Legend, the employer of Baron Abboud. The agents noticed that two corporations, ANX Corporation and Akroid Corporation, appeared in the documents. They investigated these corporations throughout the United States and with the IRS, but were not able to identify anything about ANX or Akroid. At that point in time, the FBI received documentation of John Mathewson's master client list. Akroid and ANX were on the top of the client list. The FBI was also given Mathewson's electronic Rolodex, which referenced the corporations and the targets of the FBI's investigation.

According to Agent Seubert, the MLAT documents shed light on certain unanswered questions regarding the movement of funds from 1989 through 1994 from a United Imports account in Omaha. The documents also dealt with equipment sent from overseas companies to Omaha for purposes of sale. Through the MLAT documents and the interview of Mathewson, the FBI learned that United Imports would order product through Far East manufacturers such as SK Electronics, Samsung, and Goodmine. Script Corporation would place the order with these manufacturers. The product was drop shipped to Omaha, handled through a customs broker, and an invoice was submitted to United Imports for payment. The invoices also identified a "surcharge" ranging from 10 to 40 percent above the cost of the product. Thus, law enforcement learned of defendants' alleged "overinvoicing scheme."

For example, for a product invoice of $100,000, Mathewson would decide on a 20% surcharge, for a total bill of $120,000. A check for $120,000 would be sent to Guardian Bank and deposited into the Script Corporation account. At some point, at the direction of one of the Abbouds, the $20,000 surcharge would be moved to ANX (Joseph Abboud's account) or Akroid (David Abboud's account).

The documents revealed that Gene Abboud's involvement with Mathewson was limited in the time frame. Although Gene Abboud established ANX Corporation and its use, Joseph and David Abboud later took control of ANX Corporation. Susan Germer had signed some form of agreement with Guardian Bank. Another document showed Germer making an inquiry on Everquest letterhead regarding a shipment of product coming from the Far East.

Seubert testified that, between October 1990 and June 1992, 14 checks totaling $2.7 million were sent by United Imports to Guardian Bank for deposit in one of the shelf corporation accounts. Between November 1992 and December 1994, 30 checks totaling $8 million were deposited

by United Imports in the Cayman shelf corporation accounts. All of those checks were deposited directly in the Script Corporation account; portions were then transferred to the ANX or Akroid accounts.

The significance of these discoveries was that the FBI could identify the Akroid investment account and the ANX account at Charles Schwab. In Fall 1998, they investigated and interviewed other individuals who had been "caught" in the New Jersey Cable Trap investigation. These individuals were either indicted or provided information and pled guilty of various cable television violations.

Agents Goffi and Seubert testified regarding these events before the Nebraska grand jury. Goffi's grand jury testimony identified purchasers of defendants' product in Long Island, New York; Tucson, Arizona; Flint, Michigan; Sacramento, California; and Rock Hill, South Carolina. The Nebraska grand jury testimony did not mention any purchasers from Georgia. Rather, the FBI identified purchasers from payment items obtained through a subpoena of M.D. Electronics' bank accounts. They chose to investigate certain purchasers based on the amounts of the checks written and what was noted on the memo section of each check.

As Curt Mantz testified, United Imports would contact competitors or suppliers and buy descramblers from them. During the course of the Nebraska investigation, it was determined that Frank Russo, an unindicted coconspirator, was involved in a business called Leasing Ventures and sold descramblers wholesale to Joseph Abboud and M.D. Electronics from 1990 through 1995 for retail sale by M.D. Electronics. These cable descramblers were capable of receiving pay per view and premium programming. Russo advised that Baron Abboud, acting on behalf of Joseph Abboud, purchased $250,000 worth of devices from Russo in 1990. Russo told Goffi that between 1990 and 1995, 25 percent of his sales were to Joseph Abboud and United Imports. The estimated total value of the boxes was $3 million. Russo testified before the Nebraska grand jury that, at some point, Baron Abboud was an employee of United Imports and that Baron Abboud traveled to Florida to purchase 2,500 aftermarket descrambler converter devices from Russo's company.

Edward "Trey" Prevost, another unindicted coconspirator, was interviewed on October 22, 1998. His business, Novoplex, was a wholesale supplier of descramblers to Joseph Abboud (using the name "Joe Allen") and United Imports from 1988 or 1989 through 1995. In March 1994, there were three checks payable to Prevost totaling $23,000.

William Yea was another person interviewed by the FBI and/or Secret Service. Yea was the owner/operator of U.S. Cable, a retail mail order electronics business located in Florida that purchased product from Joseph Abboud's company between 1990 and 1995. Yea and Joseph Abboud were named as defendants in a New York civil action filed by Time–Warner. After the Time–Warner action ended, Yea sold Joseph Abboud U.S. Cable's toll free number for $40,000. The actual purchase of the 800 number occurred in July 1995.

Todd Littlejohn owned and operated Freedom Electronics in Florida. He did business with Joseph Abboud from 1991 to 1994, selling $700,000 of "turned on"[7] devices to United Imports. Littlejohn was apprehended as part of the Cable Trap investigation. After his indictment and ar-

---

**7.** A "turned on" box is one that is modified or enhanced in a manner allowing full reception of all premium and all pay per view programming available in a cable area. It is the same thing as a "wide open" or "nonaddressable" box.

rest, Littlejohn sold his customer data base and his 800 number to Joseph Abboud for $20,000.

Frank Redessy was interviewed in the fall of 1998. Redessy operated Teleview corporation in the Chicago area and did business with Joseph Abboud from 1993 through the time of his interview in 1998. Redessy told the officers that, by chance, he met Joseph Abboud in Taiwan at Goodmine, a Far East manufacturer of some of the Abboud design boxes. Redessy made some "minor suggestions" for changes in some of the United Imports product, but Abboud did not take his advice. According to Redessy, Goodmine was building devices at the request of Joseph Abboud per Abboud's specifications. The Goodmine products were be manufactured in Taiwan and shipped to United Imports. Redessy was caught in Cable Trap, pled guilty, and was placed on probation.

Glenn Montelbono operated Genco out of New York and was interviewed by telephone. According to Agent Seubert, Montelbono's dealings with Joseph Abboud were minimal and occurred during 1996 and 1997. Montelbono pled guilty to criminal charges in Cable Trap and agreed to cooperate in this case.

Another grand jury witness, Sharon Snider, was an employee of Omaha Electronics, a wholesale electronics company. Joseph Abboud came in to Omaha Electronics from time to time to purchase nine volt batteries. The transcript of Snider's grand jury testimony has been filed as Exhibit 7. Snider testified that she was first approached in about 1985 and bought a device from Joseph Abboud that allowed her to receive free cable television programming.

In the spring of 1997, Omaha Electronics began selling "raw" [8] converter boxes and other electronics equipment supplied by the Abboud companies. Snider testified that Joseph Abboud told her that Omaha Electronics did not have to purchase anything up front. He would supply the units and "the Omaha customers that buy a lot." Joseph Abboud would send Omaha Electronics an original order of what he thought Omaha Electronics could sell in a certain amount of time.

In January 1998, the Abboud companies began supplying addressable boards [9] to be sold by Omaha Electronics. Omaha Electronics was not required to pay for the raw boxes and addressable boards "up front." Joseph Abboud provided Snider with an Omaha customer list and dictated the prices at which the units would be sold. Omaha Electronics made a very small profit from selling these items but the arrangement enhanced the company's cash flow. This business relationship occurred during 1997 through December 1998.

In October 1998, Snider personally purchased a cable descrambler from Gene Abboud's company, Broadway Enterprises. This box had been modified to receive basic cable, all premium channels, and all pay-per-view programming.

Agent Seubert's March 1998 testimony before the Grand Jury described the information received from these individuals and the information from John Mathewson regarding the allegations of international money laundering.

The Nebraska indictment was returned on April 23, 1999.

---

8. A "raw" box is "a box that you can put on a TV if it isn't cable ready, ... and it will give you a cable ready television." (Ex. 7, 8:9–12).

9. An addressable board is "a board that you can put in [a] unit, call Cox Cable and order up a pay-per-view or premium programming and then they will send it through their signals."

## II. LEGAL ANALYSIS

The Fifth Amendment to the U.S. Constitution provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; **nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb**; nor shall be compelled in any criminal case to be a witness against himself, **nor be deprived of life, liberty, or property, without due process of law**; nor shall private property be taken for public use, without just compensation.

(Emphasis added).

Defendant argues that Count 1 (conspiracy to commit wire fraud and mail fraud), Count 36 (conspiracy to commit international money laundering), and Counts 54 through 62 (substantive counts of international money laundering) must be dismissed because the conspiracy described in Count 1 is the same conspiracy for which defendant was indicted as an alleged co-conspirator in the Georgia case. Pursuant to the Georgia plea agreement, the Georgia conspiracy count was dismissed in exchange for defendant's pleas of guilty to five substantive counts involving the unauthorized interception of cable signal. Defendant contends that the Georgia plea agreement included a promise that he would not be prosecuted by the federal government for his involvement in the international money laundering conspiracy or the substantive offenses of international money laundering charged in the Nebraska superseding indictment. Thus, the Nebraska charges are (a) barred by the Double Jeopardy Clause and (b) were brought in breach of the Georgia plea agreement,

in violation of defendant's Fifth Amendment due process rights.

The government argues that jeopardy never attached to the Georgia conspiracy count because the defendants did not plead guilty and were not convicted on that charge. In any event, the conduct charged in the Nebraska indictment is different than that charged in the Georgia case and the Georgia plea agreement did not contain any promise of non-prosecution of defendant's alleged Cayman Island money laundering activity. The pending charges, therefore, were not filed in violation of defendant's Fifth Amendment rights.

### A. Double Jeopardy

■ "The Double Jeopardy Clause ... affords a defendant three basic protections[.]" *Ohio v. Johnson,* 467 U.S. at 497–98, 104 S.Ct. at 2540. "'[I]t protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.'" *Id.* (quoting *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977))." *Bally v. Kemna,* 65 F.3d 104, 106 (8th Cir.1995). However, "[y]ou can't have double jeopardy without a former jeopardy." *United States v. Torres,* 28 F.3d 1463, 1465 (7th Cir.), *cert. denied,* 513 U.S. 1059, 115 S.Ct. 669, 130 L.Ed.2d 603 (1994) (citing *Serfass v. United States,* 420 U.S. 377, 389, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975)). The Eighth Circuit has never definitely determined when jeopardy attaches to a guilty plea; it has, however, observed the general rule that jeopardy attaches when a trial court unconditionally accepts a guilty plea. *See Bally v. Kemna,* 65 F.3d 104, 107 (8th Cir.1995), *cert. denied,* 516 U.S. 1118, 116 S.Ct. 923, 133 L.Ed.2d 852 (1996); *United States v. Britt,* 917 F.2d 353, 356 n. 3 (8th

Cir.1990). If the charges are tried before a jury, jeopardy attaches when a jury is empaneled and sworn. If a nonjury criminal trial is held, jeopardy attaches when the court begins to hear evidence. *Bally*, 65 F.3d at 107 (citing *Ricketts v. Adamson*, 483 U.S. 1, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987)).

The record shows that the conspiracy count did not go to trial and defendant was not convicted of conspiracy in Georgia. The Georgia conspiracy count was dismissed in exchange for defendant's pleas of guilty to five substantive counts of unauthorized reception of cable television services in violation of 47 U.S.C. § 553. While jeopardy attached with respect to the five § 553 counts, jeopardy did not attach to the Georgia conspiracy charge. Thus, the pending conspiracy charges do not violate defendant's Fifth Amendment rights in this respect.

### B. Due Process / Alleged Breach of Plea Agreement

Defendant also argues that the government breached the Georgia plea agreement by filing the current conspiracy charges.

A plea agreement is contractual in nature and generally governed by ordinary contract principles. *United States v. Brown*, 801 F.2d 352, 354 (8th Cir. 1986). A plea agreement is more than merely a contract between two parties, however, and must be attended by constitutional safeguards to ensure a defendant receives the performance he is due. *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427[ ] (1971). *United States v. Britt*, 917 F.2d 353, 359 (8th Cir.1990). Allowing the government to breach a promise that induced a guilty

plea violates due process. *Margalli–Olvera v. INS*, 43 F.3d 345, 351 (8th Cir.1994).

Defendant argues that the government breached the Georgia plea agreement in two respects: (1) by indicting defendant in Nebraska with the same conspiracy, i.e., Count 1, that was dismissed pursuant to the plea agreement; and (2) by charging defendant with international money laundering (Count 36) in violation of the plea agreement.[10]

### 1. Comparison of Conspiracy Counts

In response to defendant's first point, the court must decide whether Count 1 of the Nebraska indictment is the same as the conspiracy charge dismissed pursuant to the Georgia plea agreement.

It has long been established that the Double Jeopardy clause prohibits subdivision of a single conspiracy into multiple violations of the same statute. *Braverman v. United States*, 317 U.S. 49, 52–53, 63 S.Ct. 99, 87 L.Ed. 23[ ] (1942). The agreement itself is the prohibited conduct; if there is but one agreement, there is but one offense. [Id. at 54, 63 S.Ct. 99.] Because a prosecutor might use different overt acts to bring separate prosecutions against the same person for the same conspiracy, the "same elements" test of *Blockburger [v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ]*, is not applicable to conspiracies. *United States v. Petty*, 62 F.3d 265, 267 (8th Cir.1995). *United States v. Johnson*, 973 F.Supp. 1102, 1106 (D.Neb.1997).

To determine whether a defendant has been prosecuted twice for the same conspiracy, the court applies a "totality of the circumstances" analysis focusing on five

---

**10.** The government agrees that if the Georgia plea agreement included an express promise of non-prosecution of defendant's Cayman Island money laundering activity, the Nebraska U.S. Attorney's Office would be bound by that agreement; however, no such promise was made in Georgia. Government's Post–Hearing Brief, pp. 2–3.

factors to ascertain whether more than one conspiracy existed. "We compare the putative conspiracies considering whether there was overlap of: (1) time the conspiracies existed; (2) personnel; (3) statutory offenses charged; (4) overt acts charged; and (5) place where the acts alleged as part of the conspiracy occurred." *United States v. Ledon,* 49 F.3d 457, 461 (8th Cir.1995). The analysis may be based on comparison of the indictments as well as other evidence submitted by the parties. *Ledon,* 49 F.3d at 461. *See also United States v. Standefer,* 948 F.2d 426, 431 (8th Cir.1991); *United States v. Bennett,* 44 F.3d 1364, 1376 (8th Cir.1995).

The court will now undertake a comparison between the alleged Georgia conspiracy and the conspiracy alleged in Count 1 of the Nebraska indictment.

### a. Time the conspiracies existed

### i. Georgia Conspiracy

The Georgia conspiracy allegations are summarized above in section IB. The Georgia indictment alleged that a conspiracy existed from August 1992 through February 1993 to commit the offenses of wire fraud, unauthorized interception and reception of cable service, and domestic money laundering.

### ii. Nebraska Count 1 Conspiracy

Count 1 of the Nebraska superseding indictment alleges 34 overt acts committed between 1989 and 1998 in furtherance of a conspiracy to commit multiple violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 47 U.S.C. § 553(a)(1) (unauthorized interception of cable system communication services), i.e., "offenses involving fraud in the marketing, distribution and sale of cable television converter/ descramblers ... with the common purpose of defrauding companies that provide cable television service to subscribers."

### b. Personnel

### i. Georgia Conspiracy

The defendants charged with conspiracy in the Georgia case were Joe Abboud, Gene Abboud, United Imports Corp. a/k/a M.D. Electronics, and G & A Distributing, Inc. The overt acts alleged referred to the defendants' contacts with Denver Mock, the purchase of the Scientific Atlanta equipment, the delivery of the Scientific Atlanta equipment, and payments made from defendants' bank accounts at Hawkeye Bank of Council Bluffs, Iowa and First National Bank of Omaha.

### ii. Nebraska Count 1 Conspiracy

Defendants David Abboud, Joseph Abboud, Baron Abboud, Gene Abboud, Susan Germer, United Imports Corp. d/b/a M.D. Electronics, G & A Distributing, Inc. d/b/a Broadway Enterprises, and Infinite Electronics are charged with the 1989–1998 conspiracy to commit mail fraud, and wire fraud, and theft of cable services. Frank Russo, Edward "Trey" Prevost, William Yea, Todd Littlejohn, Frank Redessy, Glenn Montelbono, and Sharon Snider were identified during the hearing as unindicted coconspirators or participants in this regard.

### c. Statutory Offenses Charged

### i. Georgia Conspiracy

The Georgia indictment alleged that the defendants conspired, in violation of 18 U.S.C. § 371, to commit the offenses of wire fraud (18 U.S.C. § 1343) and theft of cable services (47 U.S.C. § 553(a)) in furtherance of a scheme to defraud cable companies of money. The substantive domestic money laundering charges (18 U.S.C. § 1957) alleged in Counts 14–18 of the Georgia indictment served as some of the overt acts alleged in furtherance of the conspiracy. The money laundering

charges were based on four checks drawn on Hawkeye Bank that were deposited into an account held by "D.M. Associates, Inc." at BankSouth, Marietta, Georgia.

### ii. Nebraska Count 1 Conspiracy

This conspiracy involves alleged violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 47 U.S.C. § 553(a)(1) (unauthorized interception of cable system communication services).

### d. Overt Acts Charged

### i. Georgia Conspiracy

As discussed above, the Georgia indictment charged approximately 30 overt acts committed between August 17, 1992 and February 1993 in furtherance of the conspiracy, including four purchases of Scientific Atlanta converter boxes and decoders by Gene Abboud and G & A Distributing from Denver Mock; Gene Abboud's paying for shipments of cable equipment; Gene Abboud's acceptance of each shipment of cable boxes; Gene Abboud's deliveries of cable boxes to M.D. Electronics; M.D. Electronics' payments to G & A Distributing for the cable boxes; modification of cable boxes by M.D. Electronics and Joseph Abboud; shipment of modified cable boxes to customers; interstate wire communications between Gene Abboud and Denver Mock on October 12 and 13, 1992; shipment of a modified Scientific Atlanta box via UPS from Texas to Gene Abboud and G & A Distributing on February 9, 1993; the sale of modified cable boxes to certain retail customers; assisting in the unlawful interception and reception of premium and pay-per-view cable service by certain retail customers; cable theft by retail customers; and bank deposits related to the sales of the cable boxes.

### ii. Nebraska Count 1 Conspiracy

As summarized in this court's Report & Recommendation filed May 25, 2000 (# 241), the superseding indictment alleges 34 overt acts committed between 1989 and 1998 in furtherance of the Count 1 conspiracy. These acts include:

- David and Joseph Abboud traveling from Nebraska to Grand Cayman Island on several occasions to purchase Script Corporation; to meet with John Mathewson at Guardian Bank to discuss purchases from and payments to suppliers; the operation of Script Cable and Wireless; Joseph Abboud's use of the Charles Barkley alias; courier service to be used from Nebraska to Grand Cayman Island.

- Numerous telephone calls or fax transmissions made by David and Joseph Abboud to John Mathewson at Guardian Bank on Grand Cayman Island instructing him to purchase or pay various manufacturers for converter/descramblers; directing Mathewson to send documents to Robert Branlinger of Cable Services, Inc., in Williamsport, Pennsylvania.

- On August 16, 1992, Joseph Abboud caused a letter signed by Charles Barkley to be faxed from Script Cable and Wireless to Cable Services, Inc., in Williamsport, Pennsylvania.

- Telephone calls or wire communications by Joseph Abboud to Script Corporation to purchase converter/descramblers.

- Meeting between Joseph Abboud and representatives of Omaha Electronics to set up a distributorship for the components of converter/descramblers.

- Purchases of a total of 700 converter/descramblers by Joseph Abboud from Leasing Ventures in Hollywood, Florida.

- United Imports' purchase from Gene Abboud of a total of 140 converter/descramblers.

- On September 13, 1993, Todd Littlejohn d/b/a Freedom Electronics purchased converter/descramblers from Everquest, the wholesale division of defendant United Imports.
- Purchase of 1–800 telephone numbers and customer lists by Joseph Abboud from William Yeh d/b/a U.S. Cable and Todd Littlejohn d/b/a Freedom Electronics.
- Placement of magazine advertisements by Joseph Abboud and David Abboud.
- On November 12, 1992, Baron Abboud opened a bank account in the name of Script Cable and Wireless at Barnett Bank in Fort Lauderdale, Florida.
- Establishment of bank accounts by co-defendants Gene Abboud, David Abboud and Susan Germer.
- In 1992, Baron Abboud traveled to Florida and purchased 2,500 "after market" converter/descramblers from a cable pirate.
- Sales of converter/descramblers by United Imports to six individual customers.
- Facsimile transmission by Joseph Abboud to Omaha Electronics a list of companies that would purchase the components of converter/descramblers from Omaha Electronics.
- Susan Germer instructed and demonstrated to a person known to the grand jury how to modify a converter/descrambler to receive unauthorized premium and pay-per-view television programming.

### e. Place Where Acts Occurred

### i. Georgia Conspiracy

The Georgia indictment refers to defendant companies' locations in Omaha, Nebraska and Council Bluffs, Iowa, and specific business transactions affecting the Northern District of Georgia. The Georgia investigation was initiated, in part, due to a complaint made by a Georgia company, Scientific Atlanta. The indictment (¶ 15) noted that it is a felony in Nebraska to "send in intrastate commerce any electronic, mechanical, or other device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the unauthorized interception of wire, electronic, or oral communications," or to manufacture, assemble, possess, or sell any such device. The Georgia indictment alleged that the defendants did not sell descramblers in Nebraska, but instead used toll-free numbers to sell descramblers to customers in states with electronic interception laws similar to Nebraska's laws. The defendants, who were physically located in Omaha, made "800 number" sales of modified Scientific Atlanta boxes to Georgia residents identified as Paul Harr, Ronald Hardaway, Larry Clemmons, Gregory Panasuk, Richard Carrier and Sam Billingsley, who allegedly used the equipment in Georgia. Cooperating witness Denver Mock, present in the Northern District of Georgia, used interstate wire transmissions to sell modified Scientific Atlanta descramblers to Gene Abboud and G & A Distributing in Council Bluffs. The Scientific Atlanta equipment was shipped from Georgia to Omaha, Nebraska and was delivered to M.D. Electronics in Nebraska. Deposits and payments were made through defendants' banks in Council Bluffs and Omaha. The defendants also caused a Texas company to ship a modified Scientific Atlanta box to Gene Abboud and G & A Distributing.

### ii. Nebraska Count 1 Conspiracy

Count 1 of the superseding indictment identifies defendants' principal place of business as Omaha, Nebraska. It references the following activities, none of which occurred in Georgia.

- Travel by the defendants from Nebraska to Grand Cayman Island

- Establishment of bank accounts in Nebraska and Grand Cayman

- Numerous telephone calls, fax transmissions, or wire communications made by defendants from Omaha to Grand Cayman Island

- Meetings in Omaha between Joseph Abboud and representatives of Omaha Electronics to set up a distributorship for the components of converter/descramblers

- Business transactions and communications between the defendants (in Omaha) and customers in other states, including Florida, Pennsylvania, North Carolina, Colorado, New Jersey, and California

- Defendants' sale of two converter/descramblers to a resident of Lincoln, Nebraska in January 1998

- Defendants' placement of advertisements in nationally-circulated magazines

### f. Findings and Conclusions

As the Eighth Circuit said in *United States v. Aguilera,* 179 F.3d 604 (8th Cir. 1999),

It is well settled that the Double Jeopardy Clause prohibits the government from subdividing a single criminal conspiracy into multiple violations. *See United States v. Okolie,* 3 F.3d 287, 289 (8th Cir.1993). "To support a double jeopardy claim, a defendant must show the multiple charges reflect the same offense, both legally and factually." *United States v. McDougal,* 133 F.3d 1110, 1113 (8th Cir.1998)....

It is the defendant's burden to show a nonfrivolous claim of double jeopardy. *See Okolie,* 3 F.3d at 289. If the defendant can make this initial showing, then the burden shifts and the government must show by a preponderance of the evidence that the two conspiracy indictments charge two separate offenses.

The court assumes, without deciding, that the defendant has raised a nonfrivolous claim of double jeopardy and finds that the government has met its burden of showing by a preponderance of the evidence that the current conspiracy charges are not the same as those charged in the Georgia indictment.

First, the Georgia conspiracy took place during a six-month period in 1992–1993 and is subsumed by the Nebraska conspiracy, which is alleged to have continued almost nine years. Both conspiracies originated in the Omaha area. While the two indictments name common coconspirators (Joseph and Gene Abboud and their respective businesses), the Nebraska indictment names additional defendant coconspirators and the government has identified several unindicted coconspirators, including Prevost, Russo, Redisi, Littlejohn and Yeh. Although the two indictments involve the same statutory offense (conspiracy in violation of 18 U.S.C. § 371), it is possible to have two different conspiracies to commit exactly the same type of crime. *United States v. Aguilera,* 179 F.3d 604, 608 (8th Cir.1999). *See also United States v. Okolie,* 3 F.3d 287 (8th Cir.1993); *United States v. Tanner,* 860 F.2d 864, 867 (8th Cir.1988); *United States v. Thomas,* 759 F.2d 659, 666 (8th Cir.1985).

A comparison of the overt acts alleged in the two indictments most convincingly demonstrates that the Nebraska conspiracy is not the same as the Georgia conspiracy. The Nebraska indictment encompasses a far longer period of time and much wider variety of conduct than addressed in the Georgia indictment. There appears to be no overlap of the overt acts alleged in the Nebraska indictment with those alleged in the Georgia indictment. The

Georgia court sentenced Joseph Abboud based on the conduct performed during the six-month period of the Georgia investigation.

Considering the totality of the circumstances, I find that Joseph Abboud has not been charged in Nebraska with the same conspiracy with which he was charged in Georgia.

### 2. Terms of the Georgia Plea Agreement

■ Defendant finally contends that, in return for his pleading guilty in to five substantive counts of unauthorized reception of cable television services in violation of 47 U.S.C. § 553, the government promised not to charge him with international money laundering. Thus, the charges in Count 36 and Counts 54 through 62 of the Nebraska superseding indictment were filed in violation of the Georgia plea agreement.

The record shows that Joseph Abboud's decision to plead guilty in the Georgia case was motivated, in large part, by the knowledge that John Mathewson had been arrested and was cooperating in the Atlanta investigation. He was clearly interested in avoiding being indicted for international money laundering at that time. The court, however, can find no indication that the Georgia U.S. Attorney's Office promised Joseph Abboud that no international money laundering charges would ever be filed in any other district based on the information received from Mathewson.

Mr. Warin's letter of September 26, 1996 emphasized that defense counsel "should try to extract a commitment from the government that it will seek to dissuade other prosecutors from pursuing additional charges against all of the defendants in this investigation." (Ex. 14, p. 3).

No such agreement was referenced in the September 27, 1996 pre-plea conference (see Ex. 15 transcript).

The written plea agreement signed September 30, 1996 in open court (Ex. 16) contains no reference to potential charges of international money laundering. Mr. Weinstein testified that it was his practice to make no promises that were not contained in the written plea agreement or otherwise disclosed to the district court. It was his practice to disclose any legally binding agreements in a negotiated plea.

During the September 30, 1996 Rule 11 hearing, the court specifically asked Joseph Abboud whether there were any "side agreements" that were not included in the written plea agreement, warning Mr. Abboud that, "[b]ecause if you don't let [the court] know right now what your understanding of all the promises are, you will never be able to enforce those particular promises." Defendant indicated on the record, under oath, that he understood what the court was telling him and represented that all agreements had been disclosed to the court.

After sentence was imposed in April 1997, prosecutor, Sally Yates advised the court of the pending New Jersey investigation involving the Abbouds' companies. Yates advised the court that the Abbouds "may very well end up being prosecuted later on about that," but not in the Northern District of Georgia.

In general, courts interpret plea agreements more or less as contracts. *See United States v. Alegria,* 192 F.3d 179, 183 (1st Cir.1999). "That means, of course, that an inquiring court should construe the written document within its four corners, 'unfestooned with covenants the parties did not see fit to mention.'" *Id.* at 185 (quoting *United States v. Anderson,* 921 F.2d 335, 338 (1st Cir.1990)).

*United States v. Ortiz–Santiago,* 211 F.3d 146, 151 (1st Cir.2000).

Here, the written plea agreement was silent with respect to defendant's Cayman

Island activities. Defendant told the Georgia court that the only agreements between him and the Georgia prosecutor were those contained in the written plea agreement. I find that the conspiracy and international money laundering charges found in Count 36 and Counts 54 through 62 of the superseding indictment were not subjects of, and are not barred by, the Georgia plea agreement.

### III. DECISION

For the reasons explained above,

**IT IS RECOMMENDED** that the amended motion of defendant Joseph Abboud to dismiss Counts 1, 36, and 54 through 62 of the superseding indictment (# 148) be denied.

Pursuant to NELR 72.4, any objection to this recommendation may be made by filing a "Statement of Objection to Magistrate Judge's Recommendation" within 10 days after being served with a copy of the recommendation. The statement of objection shall specify those portions of the recommendation to which objection is made and the basis of the objection. The objecting party shall submit to the district judge at the time of filing the objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made. Failure to submit a brief in support of the objection may be deemed an abandonment of the objection. The failure to object to a finding of fact in a magistrate judge's recommendation in a dispositive matter may be construed as a waiver of that party's right to appeal the order of the district judge adopting the recommendation as to the finding of fact.