# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3786

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa |
| Julian R. Aguilera, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 11, 1998
Filed: June 9, 1999

_____

Before LOKEN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and WATERS,[1] District Judge.

_____

WATERS, District Judge.

This is an interlocutory appeal from the district court's[2] order denying Julian R. Aguilera's motion to dismiss an indictment on the basis that it violates the Double Jeopardy Clause of the Fifth Amendment. For the reasons stated below, we affirm.

_____

[1]The Honorable H. Franklin Waters, United States District Judge for the Western District of Arkansas, sitting by designation.

[2]The Honorable Charles R. Wolle, Chief United States District Judge for the Southern District of Iowa.

A.  The First Conspiracy

On June 29, 1997, police in St. Louis County, Missouri, stopped a U-Haul truck, conducted a search of the truck, and discovered several hundred pounds of marijuana.  Police arrested Fabian Escobar who was the driver of the truck, and a woman who was traveling with him.  The two had traveled by air from El Paso, Texas, to Tulsa, Oklahoma, where they rented the U-Haul. At the time he was stopped, Escobar was headed toward the Chicago/Joliet area, which was the original delivery destination.

After Escobar was arrested, he agreed to make a controlled delivery. Thereafter, Escobar telephoned Aguilera and arranged to make the delivery instead to Springfield, Illinois.  In the meantime, Aguilera asked Christina Rojas to contact Abel Ruiz and Josie Westfall, who lived in Muscatine, Iowa, about traveling to Springfield to pick up the marijuana.  Ruiz and Westfall later met with Aguilera in Davenport, Iowa, to discuss the pickup.  Thereafter, Ruiz and Westfall traveled to Springfield, where they were arrested the next day at the pick up.  After their arrest, Ruiz agreed to make a controlled delivery to Aguilera in Davenport.  Aguilera was arrested at the pickup, and during a subsequent search of his residence, marijuana and drug paraphernalia were discovered.

At trial, Aguilera moved to exclude evidence that he and Ruiz had prior conversations about the possibility of Ruiz working as a drug trafficker, moving cocaine and methamphetamine out of the Muscatine area.  The conversations occurred  approximately two months prior to the incidents charged in the first conspiracy. Aguilera's counsel argued that the prior conversations were inadmissable as evidence of prior bad acts under Rule 404(b) of the Federal Rules of Evidence, and, in addition, were highly prejudicial and therefore inadmissible under Rule 403. The district court denied the motion on the grounds that the conversations were

evidence of activity related to the conspiracy charged, and were also relevant in showing that a common plan or scheme existed.

Aguilera's counsel also objected to certain evidence that showed Aguilera made various telephone calls, prior to the time period of the first conspiracy, to Cristobal Cabrerra, Jorge Pimentel[3] and Charles LaRue, all of whom resided in Muscatine and were involved in drug trafficking. The government asserts that it was permitted to introduce this evidence as rebuttal evidence to the defense's contention that Aguilera had made no telephone calls to any of the cities involved in the first conspiracy.

Aguilera was convicted on October 9, 1997, on one count of conspiracy to distribute marijuana and one count of managing and controlling a drug house for the purpose of manufacturing, storing and distributing marijuana in violation of 21 U.S.C. §§ 846 and 856(a)(2) respectively. The time frame for the conspiracy was June 29 and June 30, 1997. Aguilera appealed his conviction to this court. All of Aguilera's claims for reversal were rejected and his conviction was affirmed in an unpublished opinion. See United States v. Aguilera, 163 F.3d 603 (8th Cir. 1998).

B. The Second Conspiracy

On April 20, 1998, Aguilera was indicted a second time on one count of conspiracy to distribute cocaine and methamphetamine in violation of 21 U.S.C. § 846. The time frame for this indictment runs from January 1, 1991, through June 27, 1997. Aguilera moved to dismiss the indictment on the ground that the second indictment contains charges from what he asserts is essentially a single overall conspiracy for which he was found guilty and sentenced in the first instance. The district court heard oral arguments on the motion to dismiss, and on October 23, 1998, entered an order denying Aguilera's motion. This appeal followed.

---

[3]Mr. Cabrerra and Mr. Pimentel's names are spelled in various ways throughout the record.

II.

It is well settled that the Double Jeopardy Clause prohibits the government from subdividing a single criminal conspiracy into multiple violations. See United States v. Okolie, 3 F.3d 287, 289 (8th Cir. 1993). "To support a double jeopardy claim, a defendant must show the multiple charges reflect the same offense, both legally and factually." United States v. McDougal, 133 F.3d 1110, 1113 (8th Cir. 1998). We review an alleged violation of the Double Jeopardy Clause de novo. See United States v. Gladfelter, 168 F.3d 1078, 1084 (8th Cir. 1999).

It is the defendant's burden to show a nonfrivolous claim of double jeopardy. See Okolie, 3 F.3d at 289. If the defendant can make this initial showing, then the burden shifts and the government must show by a preponderance of the evidence that the two conspiracy indictments charge two separate offenses. Id. In determining whether two charged conspiracies are really the same one, a court must examine "the totality of the circumstances, including the time that the alleged conspiracies existed, the identity of the coconspirators, the statutory offenses charged in the indictments, the nature and scope of the activity charged, and the location of each conspiracy's events." McDougal, 133 F.3d at 1113.

The district court did not make a determination as to whether Aguilera's double jeopardy claim is frivolous. We have previously directed district courts to make a written finding as to whether such claims are frivolous or colorable, with a frivolous finding to be followed by expedited review on appeal. See United States v. Brown, 926 F.2d 779, 781 (8th Cir. 1991). Upon review, we will dismiss the appeal for lack of jurisdiction if we also find the claim to be frivolous. Id. In this case, however, the district court held a hearing on the issue, and, thus, we may infer that the court considered Aguilera's claim to be colorable, i.e., nonfrivolous. Cf. id. (holding that

–4–

even though district court failed to state it found the motion frivolous, such a finding was inferred from the fact that the district court relied primarily on the indictments and did not hold a hearing).  Regardless, we believe that Aguilera has stated a colorable claim, and thus we will address its merits.  We note, however, that from the face of the two indictments, there is no overlap, other than the offense charged.  Further, the court has no record to review from the second case (other than the transcript from the district court's hearing and the government's proposed witness list).  Nevertheless, Aguilera has chosen to pursue an interlocutory appeal, which is his right, and we will therefore address the merits of his claim under the totality of the circumstances test.

With regard to the first factor, Aguilera argues that the time periods of the conspiracies overlap.  Aguilera concedes that the actual dates charged in the indictments do not technically overlap; the first indictment alleged a conspiracy that began on June 29, 1997, and ended one day later on June 30, 1997, while the second indictment alleges a conspiracy that occurred from January 1, 1991, through June 27, 1997.  Nevertheless, he asserts that to convict him at the first trial, the government used evidence of acts that occurred prior to June 29, 1997, e.g., the evidence of the prior conversations with Ruiz about moving cocaine and methamphetamine out of Muscatine, and the telephone calls from Aguilera to known drug traffickers in Muscatine.  Basically, Aguilera asserts that he recruited Ruiz prior to June 29, 1997, and, thus, some of the overt acts necessary for the first conspiracy took place during the time period of the second conspiracy.  This court has held on many occasions that even though conspiracies overlap at times, that does not prove that there was only one conspiracy.  See e.g. Okolie, 3 F.3d at 290 (finding that overlap of sixteen months did not prohibit finding that a separate agreement existed).  Thus, even though Aguilera may have been working on both conspiracies at the same time, that does not, on its own, prove that there was only one overall conspiracy.  Moreover, the second conspiracy charged is alleged to have continued for more than six years prior to the

beginning of the first conspiracy charged, which only lasted approximately two days. This is indicative of separate agreements. See Okolie, 3 F.3d at 290.

The second factor deals with the identity of the coconspirators. In the first conspiracy, the conspirators were Aguilera, Christina Rojas, Abel Ruiz and Josie Westfall. In the second conspiracy, the conspirators, according to the government, are Aguilera, Thomas Eagle, Charles LaRue, Ralph House and Charles Holliday. The United States concedes that Abel Ruiz and Josie Westfall may also be called to testify at the second trial, and that Westfall may even be considered a coconspirator. Aguilera asserts that in addition, Cabrerra and Pimentel could be called to testify as unindicted coconspirators. In essence, Aguilera contends that both conspiracies involve the same group of people and that the government, in proving the second conspiracy, will "parade" the same witnesses in front of the jury as they did at the first trial. Aguilera also contends that it was obvious to the jury at the first trial that LaRue, Cabrerra and Pimentel were "unindicted" coconspirators with him in trafficking cocaine and methamphetamine and, thus, it violates double jeopardy to use the same evidence to convict him of the same crime. The government contends, however, that a significant number of coconspirators involved are different in each of the conspiracies. We agree. See Okolie, 3 F.3d at 290 (holding that it is suggestive of separate agreements when the parties and their relationships differ substantially).

We next examine the specific offenses charged. Aguilera points to the fact that both indictments charge him with conspiracy to distribute narcotics in violation of 21 U.S.C. § 846. Aguilera concedes that the first indictment involved marijuana, a Schedule I narcotic, while the second indictment charges him with conspiracy to distribute cocaine and methamphetamine, which are Schedule II narcotics. Nevertheless, Aguilera contends that the offense charged in both indictments is the same. This fact alone, however, does not provide Aguilera with much support given the fact that we have held that it "is possible to have two different conspiracies to

–6–

commit exactly the same type of crime." <u>United States v. Tanner</u>, 860 F.2d 864, 867 (8th Cir. 1988) (<u>quoting</u> <u>United States v. Thomas</u>, 759 F.2d 659, 666 (8th Cir. 1985)).

Next, we examine the nature and scope of the activity charged. The first conspiracy charged Aguilera with conspiracy to distribute the marijuana that he was attempting to obtain at the time of his arrest. The conspiracy involved one load of marijuana that Ruiz and Westfall were to deliver to Aguilera. No other shipments of marijuana or other narcotics were involved. On the other hand, the second conspiracy, according to the government, involves a broader scheme to distribute many shipments of cocaine and methamphetamine over a period of several years. The government concedes there was an ongoing investigation of the second conspiracy at the time the first conspiracy, <u>i.e.</u>, the marijuana conspiracy, interceded. In fact, Aguilera's own counsel, who is also representing him in this matter, made the following statement regarding the two conspiracies:

> this conspiracy, that people were coming from El Paso and bringing marijuana in through the Southern District of Iowa, that has absolutely nothing whatsoever to do with any allegations that my client engaged two months prior in conversations with Mr. Ruiz about the possibility of bringing trucks in containing cocaine and methamphetamine.

<u>United States v. Aguilera</u>, Cr. No. 97-90, <u>Trial Transcript</u>, Volume II, at 42. We conclude that the second conspiracy alleges activity that is not only distinct from the first conspiracy, but is much broader in scope than the activity involved in the first conspiracy.

Finally, we consider the places in which the conspiratorial acts took place. The first conspiracy involved two people who flew from El Paso, Texas, to Tulsa, Oklahoma, to obtain a U-Haul truck loaded with marijuana, and then drove to Springfield, Illinois. At that time, two other people took over the U-Haul and drove

it from Springfield to Davenport, Iowa, where Aguilera was arrested. According to the government, the second conspiracy centers around Muscatine and Louisa Counties in Iowa. Muscatine was only mentioned in the first trial because Ruiz and Westfall lived in Muscatine, and some of the phone calls that Aguilera made to Cabrerra, Pimentel and LaRue were to Muscatine. In United States v. Kienzle, 896 F.2d 326, 329 (8th Cir. 1990), we held that even though two conspiracies contained some geographical overlap, each conspiracy involved places not involved in the other, and, thus, there were two separate conspiracies. The same is true in this case. Although some of the overt acts charged in the first conspiracy may have taken place in Muscatine, e.g., the phone call to Ruiz and Westfall asking them to drive to Springfield to pick up the U-Haul, there were other locations involved in the first conspiracy that are not alleged to be involved in the second conspiracy.

## III.

After carefully considering Aguilera's arguments and in weighing all of the factors stated above, we conclude that the two indictments allege two different conspiracies rather than one single overall agreement. Therefore, we affirm the district court's ruling on Aguilera's motion to dismiss.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.