Mario LOPEZ–NAVARRO, Plaintiff,

v.

Jo Anne BARNHART,[1] Commissioner of the Social Security Administration, Defendant.

No. 00–C–1580.

United States District Court,
E.D. Wisconsin.

June 11, 2002.

or specialized knowledge as opposed to scientific evidence.

1. The caption has been amended pursuant to Fed.R.Civ.P. 25(d)(1) and 42 U.S.C. § 405(g), last sentence, to reflect Jo Anne Barnhart's appointment as Commissioner of the Social Security Administration.

David F. Traver, Milwaukee, WI, for Plaintiff.

Penelope Fleming, Milwaukee, WI, for Defendant.

### *DECISION AND ORDER*

ADELMAN, District Judge.

Plaintiff Mario Lopez–Navarro ("plaintiff") brings this action under 42 U.S.C. § 405(g) for judicial review of the decision of defendant Jo Anne Barnhart, Commissioner of the Social Security Administration ("defendant" or "the Commissioner"), denying his application for disability insurance benefits under the Social Security Act. On January 30, 2002, Magistrate Judge William E. Callahan, Jr., to whom this matter had been assigned for pretrial proceedings, issued a recommendation that the decision of the commissioner be affirmed and plaintiff's appeal be denied, to which plaintiff filed timely objections. The matter is now before me for decision.

### I. FACTS AND BACKGROUND

In March 1996 plaintiff applied for benefits claiming that since April 1995 he had been unable to work as the result of complications from surgery for stomach ulcers. He was operated on in March 1994. Plaintiff indicated that he had difficulty eating because most foods gave him diarrhea, he could not lift or bend on a regular basis, had an eating disorder, and frequently felt nauseous. He stated that he was very inactive, mostly watched television, had limited social contacts, and did not drive. He related that he had moved to Milwaukee from Puerto Rico in December 1995 and had not seen a doctor since his arrival.

In his application, plaintiff wrote that he had a fifth grade education and had worked as a machine operator in a factory from 1969 to 1995. His factory job required constant heavy lifting of up to fifty

pounds. He indicated that he did not speak English and needed assistance completing the application.

In April 1996 plaintiff's claim was denied based on the consultative examination report of Dr. Daniel Jankins, the only medical information considered. Plaintiff then requested reconsideration. He indicated that he had worked for thirty-six years lifting over fifty pounds, but that since his injury he was unable to work and had pain when he lifted more than five pounds. He also claimed that problems with indigestion, diarrhea, and nausea (which he related to the 1994 surgery) prevented him from working. He also stated that he had been diagnosed with high blood pressure.

In June 1996 plaintiff's request for reconsideration was denied. In reaching this decision the administration considered the records of Dr. Leonicia Valdez Melendez who had treated plaintiff in Puerto Rico in 1994.

Plaintiff requested a hearing, and on July 17, 1997 he appeared before Administrative Law Judge ("ALJ") Patricia Dreyer–Kelly with his counsel, Rafae Gutierrez. However, at the suggestion of the ALJ and in order to obtain additional medical records, counsel requested an adjournment. The ALJ stated that without additional medical records showing something more than hypertension plaintiff "hasn't got a prayer." (Tr. at 30.)

The hearing recommenced on September 16, 1997. Counsel indicated: "At this point, I do not have sufficient medical records to be able to persuade the fact-finder that Mr. Lopez has anything more than hypertension." (Tr. at 39.) The ALJ agreed to leave the record open for thirty days for the submission of additional records.

Testimony was then taken from plaintiff through an interpreter. Counsel asked the ALJ how he should proceed with the questioning "[i]n light of the absolute lack of evidence at this point." (Tr. at 40.) The ALJ advised that counsel ask plaintiff "how he feels, what his symptoms are, how much he feels he can do, what the doctors have told him, things like that." (Tr. at 40.)

Counsel then asked plaintiff how he was feeling, to which plaintiff responded that his body "feels very, very hot and my face becomes very red." (Tr. at 41.) He indicated that he had difficulty with breathing and balance, and that his head hurt. He testified that he had felt that way every day since his operation. He stated that his symptoms prevented him from working.

Plaintiff stated that he was under treatment and receiving medication for high blood pressure. He testified that he may have had other problems aside from hypertension but did not state what they were. He indicated that his doctors would send him to a specialist for his stomach complaints after his blood pressure was treated.

The ALJ then asked plaintiff if he had had further trouble with ulcers since his 1994 surgery. Plaintiff indicated that he had pain and gas and took Pepto–Bismol which helped a little. Plaintiff also testified that when he sat down or got up in bed he heard a snapping sound, apparently emanating from his abdominal area.

Plaintiff indicated that he could walk about a block after which his heart raced and that he had difficulty breathing. He stated that he could not eat out because he had to run to the bathroom. Plaintiff testified that he remained inside, and that when he went out the sunlight made him dizzy and affected his vision. He did little things around the house such as dusting and cleaning but experienced dizziness. Plaintiff testified that he could sit for an hour or an hour and a half, stand for about three hours, and lift maybe ten pounds.

Plaintiff testified that he last worked on April 5, 1995. He stated that he had been a machine operator which involved lifting buckets and sacks of forty-five to fifty pounds and operating machinery. He said that he had to leave his job because he could not do it anymore.

At the hearing, the ALJ received medical records from Drs. Melendez, Jankins, and Roumani, Dr. Melendez's records indicated that plaintiff was seen in March 1994 after several weeks of vomiting. Plaintiff was diagnosed with a duodenal ulcer with gastric outlet obstruction for which he underwent surgery—a vagotomy[2] and gastrojejunostomy.[3] His recovery was apparently uneventful.

Dr. Jankins examined plaintiff in April 1996 apparently at the request of the administration and prepared a report. He reported that plaintiff did not have any recent ulcer pain but did have occasional reflux symptoms and nausea. Plaintiff's biggest complaint was of pain just below the "xiphoid process."[4] (Tr. at 97.) Plaintiff indicated that he could lift no more than ten pounds due to pain in this area but could walk at least six to ten blocks without any significant problem. Plaintiff's blood pressure was 200/110, but he denied any significant history of hypertension. Plaintiff had a "hardened area just below the xiphoid process but ... no significant pain with palpation." (Tr. at 98.)

Dr. Jankins's impression was "status post possibly a vagotomy pyloroplasty for ulcer disease." (Tr. at 98.) Plaintiff's only problem at that point was "some superficial pain possibly surrounding scar tissue from the procedure site." (Tr. at 98.) He did not have any significant symptoms from his ulcer disease and/or reflux. Dr. Jankins also diagnosed hypertension of unknown duration and a history of illiteracy.

Plaintiff's treating physician in Milwaukee, Dr. Sami Roumani, prepared a form report in February 1997 in which he diagnosed severe hypertension and imposed restrictions of one-half hour sitting or standing; walking of one to two blocks; no frequent flexing or rotating of the head and neck; no pushing or pulling or fine manipulation; no use of the feet for operation of foot controls; no lifting more than ten pounds; and only occasional stooping, twisting, crouching, crawling, kneeling, reaching, and climbing. He restricted plaintiff's exposure to changes in temperature, moving machinery, driving, and dust. He totally restricted plaintiff from work due to the effects of plaintiff's medication. He indicated that mental health factors of motivation, stress, and night time work were also present. The restrictions were to remain in effect until plaintiff's blood pressure was controlled by a cardiologist. Dr. Roumani completed a second report in May 1997 in which he imposed identical restrictions.

Dr. Roumani's office notes from July 18, 1996 to June 12, 1997 were also received. The initial note of July 18, 1996 indicates that plaintiff was seen complaining of pain in the upper stomach area and diarrhea. His blood pressure was 160/100. Dr. Roumani prescribed Zantac and Procardia.

On August 1, 1996, plaintiff returned, complaining of headaches and occasional blurred vision. His blood pressure was 160/120. Dr. Roumani increased the Pro-

---

**2.** A vagotomy is the division of the vagus nerve. *Stedman's Medical Dictionary* 1902 (26th ed. 1995).

**3.** A gastrojejunostomy is the establishment of a direct communication between the stomach and the jejunum—the portion of the small intestine between the duodenum and the ileum. *Id.* 709; 904.

**4.** The xiphoid process is the cartilage at the lower end of the sternum. *Id.* 1431.

cardia and instructed plaintiff to get a chest x-ray and other tests. He was also to continue with the Zantac.

When plaintiff returned on August 15, 1996, his blood pressure was still high despite the medication. Dr. Roumani changed to Cardura and continued plaintiff on Zantac. Plaintiff was next seen on September 17 and had not been regularly taking his medication. His blood pressure was 180/100–110. Dr. Roumani warned plaintiff that if he did not take his medication he would have a stroke, heart attack, or kidney failure.

Plaintiff returned on September 27, had been compliant with his medication regime, but still had a blood pressure reading of 170/100. Dr. Roumani increased his dosage. Nevertheless, plaintiff's blood pressure remained high· at 180/100 when seen on October 11. Dr. Roumani supplied two different medications.

Plaintiff was seen on November 5, again with a blood pressure reading of 180/100. His medication had run out the previous week when the clinic was closed, and Dr. Roumani supplied more. Plaintiff returned on November 26 and his blood pressure was still 180/100, but plaintiff indicated that he had not been taking his medication due to the side effects of dizziness and irritability. Dr. Roumani prescribed a different medication.

Plaintiff was seen twice in December with his blood pressure readings remaining high. There was a dispute as to whether plaintiff was taking his medication as ordered. However, when plaintiff returned on January 3, 1997, it was noted that he had been compliant but still had a reading of 170/110. Dr. Roumani supplied yet another medication, Tenex, and referred plaintiff to Dr. Tanvir Bajwa, a cardiologist. When plaintiff was next

seen, on January 17, he had been taking the Tenex and reported feeling better, but · his blood pressure was still 160/100.

Plaintiff was seen on February 11, but this time his blood pressure was 180/100 despite compliance with the Tenex regimen. Dr. Roumani increased the dosage and again referred him to Dr. Bajwa. Plaintiff returned on May 28 reportedly having seen Dr. Bajwa in the interim for follow up.[5] He reported headaches and occasional heart racing. His blood pressure was 170/102. A new medication was provided. The final note of June 12, 1997 indicates that plaintiff's headaches and heart racing had resolved, but his hypertension remained uncontrolled. Yet another medication was added.

At the hearing, the ALJ suggested that plaintiff's counsel obtain a doctor's statement explaining why a person with high blood pressure would be subject to severe restrictions on work activity. She indicated that she needed "cause and effect" concerning the relationship between hypertension and the restrictions on work and activity. (Tr. at 50.) Following the hearing the ALJ received records from Dr. Bajwa and Froedert Hospital. Dr. Bajwa's August 25, 1997 letter indicated that plaintiff's blood pressure was 170/100. He wrote that plaintiff is "non-compliant with medication because of the fact that he can not afford it." (Tr. at 114.) Dr. Bajwa added a new medication and instructed plaintiff to obtain an echocardiogram and stress test at County Hospital.

Plaintiff was admitted to Froedert Hospital from October 6 to 10, 1997 with a history of GI bleeding. The diagnoses were status post gastrojejunostomy, duodenal bulb stricture, three ulcers, esophagitis, and possible chronic renal failure

---

**5.** There are no medical records in the file to document a visit to Dr. Bajwa during this time. The records show that Bajwa first saw plaintiff in August of 1997.

related to hypertension. He was advised to continue H2 blocker therapy and seek a surgical consult for evaluation of the gastrojejunostomy plus performance of an anti-ulcer procedure. He was discharged on October 10 without specific activity restrictions but with multiple medications.

On March 20, 1998, ALJ Kelly issued a decision finding that plaintiff did not have any impairment(s) which significantly limited his ability to work and thus was not disabled under the Act. On April 1, 1998, plaintiff, represented by new counsel, requested review of the ALJ's decision by the Appeals Council. Plaintiff submitted additional medical records from the Sixteenth Street Community Health Center and Milwaukee Nephrologists, and the report of Dr. Tom Bachhuber.

Plaintiff was seen at the Sixteenth Street Center for gout, renal insufficiency, hypertension, probable coronary artery disease, right shoulder pain, and chronic gastritis. The records from Milwaukee Nephrologists reveal that plaintiff was seen there for chronic renal insufficiency likely due to longstanding hypertension.

Dr. Bachhuber completed a Residual Functional Capacity Questionnaire on August 30, 2000, in which he listed plaintiff's diagnoses as gout, renal insufficiency, hypertension, peptic ulcer disease, upper gastrointestinal disease, and bile reflux gastritis. He indicated that plaintiff suffered from pain in his left ankle, foot, and knee, impaired sleep and anxiety. He opined that plaintiff's pain was sufficiently severe to constantly interfere with attention and concentration. He further indicated that plaintiff's hypertension medication caused lightheadedness.

Dr. Bachhuber opined that plaintiff could sit or stand for one hour at a time, stand or walk less than two hours during an eight hour day, required periods of lying down during an eight hour day due to pain or fatigue, required a job that would permit shifting positions at will, required elevation of his legs while sitting, needed a cane or other assistive device to walk or stand and could occasionally lift ten pounds. Plaintiff was also restricted in reaching overhead due to chronic right shoulder pain. Finally, Dr. Bachhuber opined that plaintiff would miss more than three days of work per month due to his impairments.

The Appeals Council considered the additional evidence but nevertheless denied plaintiff's request for review. This action followed.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review of Magistrate's Recommendation

Where a party timely objects to a magistrate's recommendation, I conduct a de novo review of the objected to portions, 28 U.S.C. § 636(b)(1); *see United States v. Raddatz,* 447 U.S. 667, 673–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); and may review de novo any other aspects as I see fit. *See Delgado v. Bowen,* 782 F.2d 79, 81–82 (7th Cir.1986). Because plaintiff has objected, I will conduct a de novo review.

### B. Manner of Proving Disability

█ Under the Social Security Act, a person is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security regulations prescribe a sequential five-step test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. Under this test the ALJ must determine: (1) whether the

claimant is presently unemployed; (2) if so, whether the claimant has a severe impairment or combination of impairments; (3) whether any of the claimant's impairments are listed by the Social Security Administration as being so severe as to preclude substantial gainful activity; (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past work; and (5) if not, whether the claimant is able to perform any other work in the national economy in light of his age, education, and work experience. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir.2000); *Rucker v. Chater,* 92 F.3d 492, 494 (7th Cir.1996).

A claimant will automatically be found disabled if he makes the requisite showing at steps one through three. *See Henderson ex rel. Henderson v. Apfel,* 179 F.3d 507, 512 n. 3 (7th Cir.1999). If the claimant is unable to satisfy step three, he must then demonstrate that he lacks the RFC to perform his past work. *Id.* If he makes this showing, the burden then shifts to the Commissioner to establish that the claimant can engage in some other type of substantial gainful employment. *Id.* If this showing is not made, the claimant is found disabled.

## C. Standard of Review of ALJ's Decision [6]

 Under section 405(g), a district court may affirm, modify, or reverse an ALJ's decision with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). However, review of the decision is limited, and the ALJ's findings must be upheld if supported by substantial evidence. *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995). Substantial evidence is such evidence as a reasonable mind would accept as adequate to support a conclusion.

*Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. *Young v. Secretary of Health and Human Services,* 957 F.2d 386, 388–89 (7th Cir.1992). The court must review all the evidence in the record, and such review " 'must be more than an uncritical rubber stamp.' " *Delgado,* 782 F.2d at 82 (quoting *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir.1984)).

 The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and determine the case accordingly. *See Richardson,* 402 U.S. at 399–400, 91 S.Ct. 1420. A reviewing federal court may not decide the facts anew, re-weigh the evidence, or substitute its judgment for that of the ALJ. *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. *Id.* However, if the ALJ commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.; see also Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989). An ALJ also commits a reversible error if she fails to abide by the Rulings of the Social Security Administration ("SSRs"). *See Prince v. Sullivan,* 933 F.2d 598, 602 (7th Cir.1991).

 Finally, the ALJ's decision must demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion. *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir.1996). "Even if enough evidence exists in the record to support the

---

**6.** Where, as here, the Appeals Council declines to review an ALJ's decision, it is the decision of the ALJ that is the subject of

district court review. *Eads v. Secretary of Dept. of Health and Human Services,* 983 F.2d 815, 817 (7th Cir.1993).

decision, [the court] cannot uphold it if 'the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.'" *Hodes v. Apfel*, 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996)). And "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan*, 98 F.3d at 970.

## III. DISCUSSION

### A. ALJ's Decision on Plaintiff's Claim

The ALJ denied plaintiff's claim at step two of the process, finding that plaintiff did not have any impairment or impairments that significantly limited his ability to perform basic work-related activities. She wrote that plaintiff's "medically determinable impairments could not reasonably cause the pain and symptoms alleged." (Tr. at 18.) She found that the medical evidence showed that plaintiff had a duodenal ulcer and hypertension neither of which caused more than insignificant work related limitations.

She indicated that plaintiff was diagnosed with hypertension in 1996 which was poorly controlled during 1996 and 1997 because of plaintiff's noncompliance with medication instructions. She wrote that when plaintiff took his medication his blood pressure was better controlled.

The ALJ rejected Dr. Roumani's reports imposing severe restrictions because they failed to note plaintiff's non-compliance with medication and failed to explain why plaintiff's "hypertension was so exertionally limiting." (Tr. at 19.) She concluded that "Dr. Roumani's physical capacities assessment for the claimant in 1997 is not consistent with the record, fails to provide a medical basis for these significant work restrictions, and is not entitled to controlling weight." (Tr. at 19.)

The ALJ also rejected plaintiff's ulcer problems as a severe impairment, noting that he had not treated from 1994 to mid-1997 when he experienced a second duodenal ulcer. She noted that plaintiff was given no work or activity restrictions related to his ulcers or stomach pain.

Finally, the ALJ discussed the symptoms and limitations on activity to which plaintiff testified. She found that these symptoms had not been shown to have a medically determinable cause. She concluded that when considered in light of the medical evidence plaintiff's symptoms "do not reflect an individual who is so impaired as to be incapable of engaging in any substantial gainful activity." (Tr. at 20.) She therefore concluded that plaintiff did not have a medically determinable severe impairment and was not disabled.

### B. Plaintiff's Allegations of Error

Plaintiff alleges that the ALJ committed five errors. First, he argues that the ALJ improperly stopped the evaluation of his claim at step two. Second, he claims that the ALJ improperly evaluated his alleged noncompliance with medication under Social Security Rulings ("SSR") 82–59 and 96–7p. Third, he argues that the ALJ did not consider all of his impairments in combination. Fourth, he asserts that the ALJ improperly evaluated plaintiff's treating source opinions. Finally, he claims that the ALJ improperly evaluated his complaints of pain and other symptoms. He requests that the case be remanded for a new hearing.[7]

---

7. I note that plaintiff seeks remand under sentence four of section 405(g), which generally allows the court to affirm, modify or reverse the decision of the Commissioner with or without remanding for a new hearing, rather than sentence six, which allows the court to remand the matter for consideration of "new" and "material" evidence. *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir.1997);

## C. Analysis of ALJ's Decision and Plaintiff's Arguments

Two errors on the part of the ALJ require reversal and remand for further proceedings. First, the ALJ improperly stopped the sequential evaluation process at step two. Secondly, the ALJ applied an incorrect legal standard to the treating source's opinions.

### 1. The ALJ Improperly Stopped the Evaluation at Step Two

Step two of the sequential evaluation process involves a determination of whether the claimant has a severe impairment or combination of impairments. The applicable regulation states:

If you do not have any impairment of combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

20 C.F.R. § 404.1520(c); see also 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). "Basic work activities" are "the abilities and aptitudes necessary to do most jobs," including:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

"At the second step of sequential evaluation ... medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities." SSR 85–28, 1985 WL 56856, at *4.

A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities. If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process. Id. at *3.[8]

Great care should be exercised in applying the not severe impairment concept.

---

Eads, 983 F.2d at 817. Plaintiff also does not allege that the Appeals Council's erred in refusing to review the case. This refusal leaves the ALJ's decision as the final decision of the Commissioner and means that the additional medical evidence submitted to the Council, while technically part of the administrative record, may not be considered in determining the correctness of the ALJ's decision. Diaz, 55 F.3d at 305 n. 5. Thus, while I discussed the additional records in the facts section for the sake of completeness, I will not consider them in reaching my decision.

8. See also id. ("An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered ....").

If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued.

*Id.* at *4.

■ Thus, SSR 85–28 allows the Commissioner to decide that an impairment "is 'not severe' only where the medical evidence clearly establishes that an ailment or injury has a minimal or non-serious effect on the claimant's ability to perform work-related activities." *Dunn v. Sullivan*, No. 90–C–4106, 1993 WL 730745, at *4 (N.D.Ill. Jan.29, 1993). Put another way, step two is a "de minimis screening device." *Johnson v. Sullivan*, 922 F.2d 346, 347 (7th Cir.1990) (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)); *see also Brown v. Bowen*, 827 F.2d 311, 312 (8th Cir.1987) (" '[O]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking' the subsequent steps of the sequential evaluation process.' ") (quoting *Yuckert*, 482 U.S. at 158, 107 S.Ct. 2287 (O'Connor, J., concurring)).

The ALJ made two mistakes which caused her to improperly stop the evaluation at step two. First, she erred in evaluating the significance of plaintiff's hypertension. Although the basis for her evaluation is unclear, she appears to have determined that the condition was not severe either because she considered hypertension to be *per se* insignificant, or because she believed that *plaintiff's* hypertension was not severe because he failed to control it. The first conclusion is incorrect as a matter of law, and the second lacks substantial support in the record. Moreover, the ALJ failed to apply the applicable Social Security Ruling on noncompliance with prescribed treatment—SSR 82–59.

Second, the ALJ failed to consider all of plaintiff's ailments in combination, as is required at step two. In her decision, she listed only duodenal ulcers and hypertension. However, the records from Froedert Hospital showed that plaintiff suffered from several other serious maladies. The ALJ was required to consider all of plaintiff's medical problems in combination before dismissing the claim at step two.

I address each of the ALJ's errors in turn.

### a. The ALJ Erred in Evaluating Plaintiff's Hypertension

In her decision, the ALJ wrote that plaintiff's hypertension caused only "insignificant work related restrictions" (Tr. at 18) and "could not reasonably cause the pain and symptoms alleged." (Tr. at 20.) She then asserted that "the record consistently reflects the claimant's noncompliance with medication instructions." (Tr. at 18.) She stated that he "often stopped taking his medication for days and weeks at a time .... When the claimant regularly took his medication, his blood pressure lowed [sic] and was under better control." (Tr. at 18–19.) She rejected the reports of Dr. Roumani, who had imposed restrictions based on plaintiff's hypertension, by asserting that plaintiff's blood pressure was uncontrolled when the reports were written because plaintiff was only irregularly taking his medication. She faulted Dr. Roumani for not noting plaintiff's noncompliance. "Instead, Dr. Roumani noted the claimant had a motivation problem which affected his physical health." (Tr. at 19.) Whether the ALJ determined that hypertension was not a severe impairment or found against plaintiff because he failed to control it is of no moment. In either case the ALJ was mistaken.

### i. Hypertension Can Be a Severe Impairment

 Hypertension, even without significant ancillary effects such as end organ damage, can be a severe impairment. *Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir.1986) (citing *Flynn v. Heckler*, 768 F.2d 1273, 1274–75 (11th Cir.1985) & *Martin v. Sec'y of Dept. of Health, Educ. & Welfare*, 492 F.2d 905, 909–10 (4th Cir.1974)). In *Flynn*, the court reversed and remanded the administration's step two determination that the claimant's uncontrollable, severe hypertension was not a severe impairment under 20 C.F.R. § 404.1520(c). The claimant's physicians had recommended that she not return to her former employment because " 'she has good reason to be fearful that her work will cause her blood pressure to elevate again and may possibly cause stroke or heart attacks.' " [9] *Flynn*, 768 F.2d at 1275. The court found that in the face of this uncontroverted medical testimony the finding of no severe impairment could not stand. *Id.*

 Similarly, in the present case plaintiff's physician imposed severe work restrictions based on plaintiff's uncontrolled hypertension. The ALJ cited no contrary medical report in support of her decision that plaintiff's hypertension imposed only "insignificant work related limitations." [10] (Tr. at 18.) In rejecting a claim at step two, the Commissioner "may not properly find that a claimant has a certain capacity to perform work-related activities without the support of a physician's medical assessment." *Dunn*, 1993 WL 730745, at *4 (citing *Bauzo v. Bowen*, 803 F.2d 917, 926 (7th Cir.1986)). Here, there was no medical support for the

ALJ's determination that plaintiff's condition was not severe. Instead, it appears that the ALJ made her own medical finding that hypertension could not cause restrictions. Her decision thus suffers from the same flaw as in *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir.1992), where the court stated:

> The ALJ found that the limitations described by Dr. McNeill could not be produced by Ms. Scivally's documented medical conditions. However, the ALJ did not rely upon any medical report or opinion to support this conclusion. Without such contradictory evidence, the ALJ impermissibly substituted his own medical opinion for that of Ms. Scivally's physicians.

*See also Rohan*, 98 F.3d at 970 ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Because a claim can be denied at step two only when the evidence is clear, and because the ALJ rejected uncontroverted medical evidence to the contrary, the determination must be reversed based on an error of law.

### ii. The ALJ's Finding of Noncompliance is Not Supported by Substantial Evidence

 The ALJ wrote that plaintiff was noncompliant with medication "for days and weeks at a time" (Tr. at 18), and that when compliant his blood pressure was controlled (Tr. at 19). However, the record simply does not support these assertions. While plaintiff did miss or run out of medication on a few occasions (*see* Tr. at 108, 110) and once briefly stopped taking it because of its side effects (Tr. at 108), he never went without it for weeks at a time.[11]

---

9. Much like plaintiff here, she complained of headaches and occasional dizziness. *Id.*

10. The ALJ did discuss the report of Dr. Jankins earlier in her decision, but she did not

rely on that report in making her finding of no severe impairment.

11. At the hearing plaintiff denied not taking his medication and stated that entries in the

Similarly, his blood pressure remained uncontrolled even when he faithfully took his pills. (Tr. at 103–06.) For example, on June 12, 1997, Dr. Roumani noted that plaintiff "is using Tenormin" but his "Hypertension [is] still uncontrolled." (Tr. at 103.) On January 3, 1997, Dr. Roumani noted that plaintiff "did use Accupril 10mg ... as instructed" but his hypertension is still "[o]ut of control." (Tr. at 106.) On December 3, 1996, Dr. Roumani noted that plaintiff "used the Accupril as he was instructed" but his blood pressure reading was still 170/100, requiring that the dose be doubled. (Tr. at 107.) It is clear from the foregoing that the ALJ's finding that but for plaintiff's noncompliance his hypertension would have been controlled was not based on substantial evidence.

The ALJ's decision suffers from a flaw similar to that in *Beno v. Sullivan*, No. 91–C–544, 1992 WL 153632, at *5 (N.D.Ill. Jan.27, 1992), where then-District Judge Ann Claire Williams reversed a step two determination that the claimant's hypertension was not a severe impairment. She wrote:

> The ALJ appears to credit the medical evidence that plaintiff suffers from hypertension, as well as plaintiff's testimony that she suffered from nausea and dizziness on bending and stooping as a result of her hypertension. He found, however, that the evidence does not suggest that plaintiff has an impairment because plaintiff would not have a problem if she would take her medication. What is problematic about this reasoning is that the record does not support the ALJ's conclusion that plaintiff's hypertension could be effectively controlled if she took her medication. The

most recent readings indicated that plaintiff's blood pressure was high (R. 190, 203), and there is no evidence that plaintiff did not take her medication to control her blood pressure.

*Id.* The court then remanded the case so that the ALJ could fully and accurately explain his conclusion in light of the record and, if appropriate, proceed with the five step test. *Id.* at *6. Similarly, the present case must be reversed and remanded.[12]

### iii. The ALJ Should Have Applied SSR 82–59

Before an ALJ may deny a claim based on the claimant's noncompliance with treatment she must apply the factors listed in SSR 82–59. SSR 82–59 provides that an individual who would otherwise be found to be disabled but who, without justifiable cause, fails to follow prescribed treatment that would restore his ability to work cannot, by virtue of such failure, be found to be disabled. SSR 82–59, 1982 WL 31384, at *1. The Ruling establishes conditions that must be satisfied before the administration may find that the individual has failed to follow prescribed treatment, and it then requires the administration to determine whether the failure was "justifiable." *Id.* Justifiable causes include religious objections to treatment, "intense and unrelenting" fear of surgery, and inability to afford treatment. *Id.* at *3–4. SSR 82–59 applies at step two. *Meroki v. Halter*, No. 00–C–2696, 2001 WL 668951, at *10 (N.D.Ill. June 13, 2001) ("The Commissioner may not deny benefits to a claimant if a condition that would be a severe impairment is remediable, but the claimant cannot afford the necessary medical treat-

---

medical records to that effect were there only because his blood pressure did not go down. (Tr. at 44.)

**12.** Defendant argues that the ALJ did not rely on plaintiff's alleged noncompliance but rath-

er concluded that even if uncontrolled plaintiff's impairments were not severe. Even if this were so, a remand is nevertheless required because, as discussed, uncontrolled hypertension can be a severe impairment.

ment.") (citing *Gamble v. Chater,* 68 F.3d 319, 320–21 (9th Cir.1995)).

There is evidence in this record that plaintiff was "non-compliant with medication because of the fact that he can not afford it."[13] (Tr. at 114.) Therefore, if on remand the ALJ concludes that plaintiff's hypertension should not be considered a severe impairment because he has failed to control it she must follow the protocol prescribed by SSR 82–59.

### iv. Defendant's Efforts to Rehabilitate the ALJ's Decision Fail

■ Defendant argues that an individual with hypertension " 'should be considered temporarily impaired until the hypertension is controlled with medication.' " (Defendant's Memorandum in Support of the Commissioner's Decision [R. 11] at 6, quoting Demeter, Andersson & Smith, *Disability Evaluation* 361 (1996).) She further asserts that both Dr. Roumani's opinion and the ALJ's finding are consistent with this standard because Roumani restricted plaintiff until his blood pressure was controlled, and the ALJ found that plaintiff's hypertension could be controlled by medication and therefore did not impose restrictions. However, there was no evidence before the ALJ that plaintiff's blood pressure was brought under control by medication.[14] (*See* Tr. at 103–06.) Thus, there would have been no basis for declaring him to be temporarily disabled. Further, SSR 82–59 forbids the Commissioner from denying benefits based on a finding that a condition would be a severe impairment if the claimant obtained treatment when the claimant could not afford such treatment. (*See* Tr. at 114, indicating that plaintiff was "non-compliant with

medication because of the fact that he can not afford it.")

Defendant also cites *Anderson v. Bowen,* 868 F.2d 921, 926 (7th Cir.1989) for the proposition that a condition such as hypertension may be serious and yet not impose functional restrictions. However, *Anderson* was a step five not a step two case. *Id.* at 923. Moreover, in *Anderson* the "only record evidence that [the claimant] could not perform the full range of light work [was] his own self-serving testimony that he can lift only four pounds, stand only five to six minutes before he needs to sit and can walk only half a block." *Id.* at 926. Here, Dr. Roumani imposed the restrictions at issue; plaintiff does not rest his case solely on his own testimony.

Defendant also cites *Arbogast v. Bowen,* 860 F.2d 1400, 1404–05 (7th Cir.1988) for the proposition that claimants must prove the severity of their impairments via objective medical evidence. However, *Arbogast* was a step four case, *id.* at 1403, and thus provides little guidance here.

In sum, the ALJ's findings concerning plaintiff's hypertension are not supported by the record, are contrary to law, and therefore the decision must be reversed and remanded.

### b. The ALJ Failed to Consider all of Plaintiff's Impairments

■ As noted, at step two the ALJ must consider all of the claimant's impairments in combination. SSR 85–28, 1985 WL 56856, at *3 ("A claim may be denied at step two only if the evidence shows that the individual's impairments, *when consid-*

---

**13.** It is interesting to note that the ALJ did not rely on this quote from Dr. Bajwa in finding that plaintiff was noncompliant.

**14.** I also note that in making this argument defendant cites medical records submitted to

the Appeals Council. (R. 11 at 6 n. 1, citing Tr. at 138, 149.) Under the circumstances of this case, such records may not be used to bolster or attack the decision of the ALJ. *See Diaz,* 55 F.3d at 305 n. 1.

*ered in combination,* are not medically severe . . . .") (emphasis added). Moreover, the ALJ must consider both severe and non-severe impairments at this step. *See Johnson,* 922 F.2d at 350–52.

In her decision, the ALJ listed only hypertension and duodenal ulcers as impairments. She did not consider the combined effects of the additional ailments listed in the records from Froedert—status post gastrojejunostomy with anastomosis to the astrum, duodenal bulb stricture, three ulcers, esophagitis, and possible chronic renal failure. Nor did she make specific findings concerning these maladies.[15] The ALJ must in the first instance be given the opportunity on remand to consider all of these impairments in combination.

## 2. The ALJ Applied Improper Standards to the Treating Source Reports

 "Treating source opinions must be given special consideration." *Dominguese v. Massanari,* 172 F.Supp.2d 1087, 1100 (E.D.Wis.2001). If it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence, the ALJ must give it controlling weight. *Id.* (citing SSR 96–8p).

If the ALJ finds that the opinion does not warrant controlling weight, the ALJ may not simply reject the opinion. SSR 96–2p. He still must evaluate the opinion's weight by looking at the length, nature and extent of the plaintiff and physician's treatment relationship, the degree to which the opinion is supported by evidence, the opinion's consistency with the record as a whole, whether the doctor is a specialist, and "other factors." 20 C.F.R. § 404.1527(d). "In

many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96–2p. Regardless of the weight the ALJ ultimately gives the treating source opinion, the ALJ must "give good reasons" for his decision. 20 C.F.R. § 404.1527(d)(2). *Id.*

 In the present case, there are several fundamental problems with the manner in which the ALJ treated Dr. Roumani's opinions. First, in rejecting them she stated that they were "not consistent with the record." (Tr. at 19.) This is not the correct legal standard.

Pursuant to Ruling 96–8p, the ALJ must give controlling weight to the treating source's opinion if it is "not inconsistent" with other substantial evidence in the record, *accord.* 20 C.F.R. § 404.1527(d)(2); the opinion need not, as the ALJ stated, be "consistent" with the record. This is not merely a semantic issue. The "not inconsistent" standard presumes the opinion's prominence and requires the ALJ to search the record for inconsistent evidence in order to give the treating source's opinion less than controlling weight. Under the standard imposed by the ALJ, the opinion only has controlling weight if the record supports it.

*Id.* Because the ALJ committed an error of law, the decision must be reversed and remanded. *See Prince,* 933 F.2d at 602 (ordering reversal and remand where ALJ failed to comply with a SSR).

 Second, the ALJ's factual findings concerning Dr. Roumani's opinions were incorrect. Plaintiff's blood pressure was

---

**15.** The ALJ did briefly discuss the Froedert records, but she made no findings concerning these ailments.

not uncontrolled during early 1997 because he failed to take his pills; to the contrary, the record reflects that his blood pressure was uncontrolled despite the use of several different medications. The ALJ also stated that Dr. Roumani's reports failed to note plaintiff's noncompliance. However, it is obvious from the record that Dr. Roumani was well aware of plaintiff's compliance with medication (and was vigilant to ensure it). (*See, e.g.,* Tr. at 106, where Dr. Roumani apparently counted plaintiff's remaining pills.) Indeed, it was in a review of Roumani's records that the ALJ came up with her finding that plaintiff had not always been taking his pills. Finally, the ALJ stated that Dr. Roumani wrote that plaintiff had a "motivation problem which affected his physical health." (Tr. at 19.) However, the report reveals only that, in evaluating plaintiff's work capacity, Dr. Roumani checked "motivation" along with several other mental health factors. He did not state that plaintiff's lack of motivation impacted his physical health much less his ability to control his hypertension.

■ Third, Dr. Roumani's opinions are the only medical evidence in the record discussing restrictions related to plaintiff's hypertension. The record contains no medical report contradicting Dr. Roumani's conclusions. The ALJ's rejection of Roumani's opinions, especially for the reasons given, was not reasonable under the circumstances. *See Wilder v. Chater,* 64 F.3d 335, 337 (7th Cir.1995) (reversing ALJ's decision contrary to the uncontradicted medical testimony); *Amax Coal Co. v. Beasley,* 957 F.2d 324, 327 (7th Cir.1992) ("ALJs have discretion in weighing medical evidence, but they are not free to disregard uncontradicted medical opinions.") (citation omitted).

Because the ALJ applied the wrong legal standards to the treating source's opinions, the case must be reversed and remanded.

## IV. CONCLUSION

For the foregoing reasons I decline to follow the recommendation of the magistrate judge; and

**IT IS HEREBY ORDERED THAT** the decision of the Commissioner is **REVERSED,** and this matter is **REMANDED** to the administration for rehearing consistent with this opinion.